**HOME SAVINGS ASSOCIATION SERVICE CORP., Appellant,**

v.

**Luis and Irma MARTINEZ, Appellees.**

**No. 04–88–00291–CV.**

Court of Appeals of Texas,
San Antonio.

Feb. 21, 1990.

Rehearing Denied April 24, 1990.

**53**

Winifred E. Manning, Mark Ralls, Daniel, Manning & Ralls, San Antonio, Neal Kennedy, Liddell, Sapp, Zivley, Hill & Laboon, Houston, for appellant.

Peter Torres, Jr., San Antonio, for appellees.

Before BUTTS, CHAPA and PEEPLES, JJ.

## OPINION

PEEPLES, Justice.

Home Savings Association Service Corporation appeals from a judgment rendered on a jury verdict in favor of Luis and Irma Martinez. The case arose from a home improvement contract between the Martinezes and Michael Gershenson and his company, In and Out, Inc. (collectively referred to as "Gershenson"), which was financed by a loan from Home Savings. Among other things, Home Savings con-

tends there is no evidence that it engaged in any unconscionable conduct or misrepresented the agreement between Gershenson and the Martinezes.

In February 1986, the Martinezes began discussions with Gershenson about doing renovation work on their residence. After talking to several potential lenders, Gershenson arranged for Home Savings to finance the renovation project. On February 19, 1986 the Martinezes and Gershenson signed a "Contract for Improvements (With Transfer of Lien)" in the amount of $20,-400. On the same date, the Martinezes signed a promissory note payable to Home Savings, and Gershenson assigned his contractor's lien to Home Savings. Six days later, on February 25, Home delivered two checks in the amount of $10,000, both payable jointly to In and Out and the Martinezes. The Contract for Improvements between the Martinezes and Gershenson specified, "Payment to be made as follows: Fifty percent (50%) upon loan closing at H.S.A. Fifty percent (50%) upon completion of work." For reasons not revealed by the record, on the same date the Martinezes endorsed both checks to Gershenson before any significant work had been done. Gershenson did not complete his tasks, and the work that he did was substandard. The Martinezes brought this suit against both Gershenson and Home Savings. Although both Gershenson and In and Out were served, only Gershenson answered, and neither appeared at trial. The trial court submitted two DTPA issues jointly against In and Out and Home Savings, which the jury answered in favor of the Martinezes.

The judgment against Gershenson and In and Out has not been appealed and is hereby affirmed. As to those defendants a default judgment would clearly have been proper, and in the absence of allegations that Home Savings was vicariously liable for their conduct, there was no reason for the trial court to submit issues concerning them to the jury.

■ But the judgment against Home Savings is a different matter. A unanimous Supreme Court recently reiterated

several rules concerning the liability of *lenders* who finance sales transactions that the *seller* does not properly perform:

Although a consumer suing under the DTPA need not establish contractual privity with the defendant, he must show that the defendant has committed a deceptive act which is the producing cause of the consumer's damages. *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex.1985); *Cameron v. Terrell & Garrett*, 618 S.W.2d 535, 541 (Tex.1982). The DTPA does not attach derivative liability to a defendant based on an innocent involvement in a business transaction. *See, e.g., Light v. Wilson*, 663 S.W.2d 813, 814 (Tex.1983); *Cameron*, 618 S.W.2d at 541; *Building Concepts, Inc. v. Duncan*, 667 S.W.2d 897, 901 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). To hold a creditor liable in a consumer credit transaction, the creditor must be shown to have some connection either with the actual sales transaction or with a deceptive act related to financing the transaction. *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983); *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 389 (Tex.1982).

*Home Savings Ass'n v. Guerra*, 733 S.W.2d 134, 136 (Tex.1987).

In other words, Home Savings is not liable for the acts and omissions of Gershenson unless it committed its own DTPA violations or is vicariously liable.[1]

### 1. Unconscionability.

■ The Martinezes obtained findings of two DTPA violations against Home Savings, and the question is whether those two findings are supported by legally sufficient evidence. First, the jury found that Home engaged in an unconscionable action or course of action. Section 17.50(a) of the DTPA provides:

A consumer may maintain an action where any of the following constitute a producing cause of actual damages:

\* \* \* \* \* \*

(3) any unconscionable action or course of action by any person.

Section 17.45 of the DTPA defines "unconscionable action or course of action" as an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

The court's charge used the definition in section 17.45(5)(A) [grossly unfair] but did not submit the 17.45(5)(B) definition [gross disparity]. Thus, even though the Martinezes' brief and the dissent argue that there was a gross disparity, that theory of recovery has been waived because it was not submitted or requested. TEX.R.CIV.P. 279. In any event, we could not say that the Martinezes suffered from a gross disparity between the value they received from Home Savings (two checks totaling $20,000, which they endorsed to Gershenson) and the consideration they paid (a promissory note in the principal amount of $20,400; two payments made totaling $597.20). Whether there was a gross disparity between the value received *from Gershenson* and the consideration paid is a totally different issue that has nothing to do with the case against *Home Savings*.

The court submitted only the "gross unfairness" definition of unconscionability. Recent supreme court decisions have required a high level of proof to constitute evidence under section 17.45(5)(A) that a defendant has "take[n] advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." A unanimous court has held that the statute requires the following proof:

Taking advantage of a consumer's lack of knowledge to a grossly unfair degree thus requires a showing that the result-

---

1. The Martinezes did not urge vicarious liability in the trial court, and the court did not submit any such theory to the jury. Nevertheless, their brief does state that Home was "inextricably intertwined" with Gershenson. That contention is discussed in section three *infra*.

ing unfairness was *glaringly noticeable, flagrant, complete and unmitigated.* Based on the record as a whole, we find no evidence that the Chastains and the other three couples were taken advantage of to a grossly unfair degree.

*Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985) (emphasis added). The *Chastain* definition of gross unfairness was reaffirmed in *Brown v. Galleria Area Ford, Inc.,* 752 S.W.2d 114, 116 (Tex.1988).

■ Like the court in *Chastain,* we find no evidence that Home Savings took advantage of the Martinezes to a grossly unfair degree, or for that matter, to any degree. The record contains testimony by Mrs. Martinez that Home's closing agent, Margo Hernandez, assured her that Gershenson was reputable, that he could be trusted, that Home would make him cure any problems that arose, and that remodeling would increase the value of the house and therefore would be better than buying a new house. The record also shows that Home Savings did not correct Gershenson's poor workmanship and that the closing agent was not familiar with his reputability. Mr. and Mrs. Martinez were having second thoughts about entering the transaction, and Home's reassurances convinced them to enter the contract with Gershenson. Home's closing agent did not recall making these statements, and said she could be fired for saying such things, but under the no-evidence standard of review, we consider only the evidence that supports the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

Accepting these statements and actions as established, we hold that they do not constitute evidence of "taking advantage," and certainly do not constitute evidence of "gross unfairness," as defined by law. As the Supreme Court said in *Chastain,* "we must find evidence not simply that Koonce and Stroud [defendants] took unfair advantage of the purchasers but that the advantage was grossly unfair." 700 S.W.2d at 582. "Knowledge or intent alone," said the court, is not "the distinguishing factor of unconscionability." *Id.* The reviewing court must examine the entire transaction and not simply inquire "whether the defendant intended to take advantage of the consumer or acted with knowledge or conscious indifference." *Id.* at 583. The unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Id.* at 584.

We note again that in the present case, even if the conduct of Gershenson and In and Out (the contractor) rose to this level of grossness, the record must show that Home Savings' independent conduct also rose to the required level because the law requires proof that Home (the lender) itself violated the DTPA. *Home Savings Ass'n v. Guerra,* 733 S.W.2d at 136. We also consider it significant that the *Chastain* court found no evidence of gross unfairness on a much stronger set of facts than exists in the present case. In *Chastain,* the defendants had sold tracts of land to the plaintiffs and had promised that certain adjacent lots would be used only for residential purposes. In the court's words, "Koonce and Stroud [defendants] made representations calculated to induce these purchasers to buy the lots and which enhanced the desirability of the property." 700 S.W.2d at 581. Even though the defendants later allowed an oilfield pipe storage yard on one of the supposedly restricted residential lots next to the plaintiffs, the court held that there was no evidence of gross unfairness as defined in § 17.45(5)(A).

The supreme court's recent decision in *Brown v. Galleria Area Ford, Inc.,* 752 S.W.2d at 116, reaffirmed *Chastain*'s requirement of "glaringly noticeable, flagrant, complete and unmitigated" unfairness. In *Brown,* the court upheld the jury's finding of gross unfairness on facts that we find instructive in comparison to our own. The Browns had taken their wrecked truck to Lamarque Ford for repairs. In the meantime defendant Galleria Area Ford bought Lamarque and took over the day-to-day operations. Unknown to the Browns, Lamarque and Galleria had agreed that *Lamarque* would receive the payments for work in progress like that of the Browns, but *Galleria* was to do the work.

That is, the entity responsible for repairing the truck (Galleria) was not receiving payment and therefore had no economic incentive to repair the truck. "Consequently, the Brown's truck was suspended in limbo between the old owners and the new owners of the dealership." *Id.* While their truck languished in its unrepaired condition, no one told the Browns of the true arrangement, but Galleria told the public that only the names had changed and that it and Lamarque were "still the same happy folks."

These facts, said the court, constituted evidence that "Galleria took advantage to a grossly unfair degree of the Browns' lack of knowledge concerning the internal working relationship and agreements that allocated responsibility and liability between themselves and Lamarque." *Id.* In the present case, by contrast, there is simply no suggestion or evidence of hidden dealings between Home Savings and Gershenson or divergence between the truth and what was represented to the public.

We conclude that the record does not contain legally sufficient evidence that Home Savings *took advantage* of the Martinezes to a *grossly unfair* degree as defined in *Chastain* and *Brown.* Points one and two are sustained.

### 2. *Misrepresentation.*

■ The jury also found "that Home Savings Association represented to the plaintiffs that the contract of February 19, 1986 conferred or involved rights, remedies or obligations it did not have." Section 17.46(b)(12) of the DTPA makes it unlawful to "represent[ ] that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Home Savings contends in points five and six that there is no evidence to support the jury's finding. The Martinezes point to two aspects of the testimony in support of the finding: the closing agent's statements that Home would make Gershenson remedy any de-

fects and her statement later that Home was not responsible for Gershenson's failure to complete the job.

As noted earlier, Mrs. Martinez testified that the closer, Margo Hernandez, said Gershenson was reputable and that if problems arose Home would make sure they were remedied. These statements do not purport to be representations that the February 19 Contract for Improvements conferred any rights, remedies, or obligations one way or the other. The closing agent did not say that the written contract gave the Martinezes a contractual right to make Home remedy Gershenson's defects. Even if the words of the closer suggest an independent contractual undertaking by Home to step in if Gershenson defaulted, the Martinezes did not urge in the trial court, and have not argued here, that Home contractually obligated itself to remedy any defects. We are, of course, limited in this appeal to the legal theories on which the case was tried in the trial court. *Spring Branch Ind. Sch. Dist. v. Stamos,* 695 S.W.2d 556, 559 (Tex.1985), *appeal dism'd,* 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986); *Davis v. Campbell,* 572 S.W.2d 660, 662 (Tex.1978). The Martinezes did not argue that Home itself breached any agreement, and in any event, "[a] mere breach of contract is not a violation of the DTPA." *La Sara Grain Co. v. First Nat'l Bank,* 673 S.W.2d 558, 565 (Tex.1984).[2]

■ To be actionable under section 17.-46(b)(12), the statement must misrepresent one's rights, remedies, or obligations under the contract itself. *Freeman v. Greenbriar Homes, Inc.,* 715 S.W.2d 394, 396 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *Computer Business Services, Inc. v. West,* 627 S.W.2d 759, 761 (Tex.App.—Tyler 1981, writ ref'd n.r.e.); *see* Bragg, *Now We're All Consumers! The 1975 Amendments to the Consumer Protection Act,* 28 BAYLOR L. REV. 1, 21 (1976) (under § 17.46(b)(12) all plaintiff needs to show is

---

**2.** We express no opinion as to whether the record would have supported a finding that Home orally agreed to cure any of Gershenson's defects. The Martinezes did not try to obtain

jury findings that Home made and breached such an oral contract. Even if they had done so, under *La Sara* those findings would not have established a DTPA violation.

"that the *terms* of an agreement have been misrepresented") (emphasis added).

In contrast to the facts in the present case, the decisions upholding DTPA liability under section 17.46(b)(12) have invariably involved misrepresentations about the terms of the underlying contract. *See, e.g., Royal Globe Ins. Co. v. Bar Consultants, Inc.,* 577 S.W.2d 688 (Tex.1979) (agent misrepresented insurance policy's vandalism coverage); *Leal v. Furniture Barn, Inc.,* 571 S.W.2d 864 (Tex.1978) (defendant's representations that layaway agreement gave it the right to retain purchaser's deposits, when agreement gave it no such right, was a " 'false, misleading or deceptive act or practice' of the type that the legislature intended to proscribe" in section 17.-46(b)(12)); *Tidelands Life Ins. Co. v. Harris,* 675 S.W.2d 224 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.) (agent misrepresented insurance policy's coverage of preexisting heart problems); *Wagner v. Morris,* 658 S.W.2d 230 (Tex.App.—Houston [1st Dist.] 1983, no writ) (defendant misrepresented interest rate on note). There is no indication in *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670 (Tex.1989), that the supreme court has departed from § 17.46(b)(12)'s requirement of proof that the defendant represented *"that an agreement confers or involves rights, remedies or obligations* which it does not have or involve." (emphasis added). There the seller of a Harley–Davidson dealership misrepresented the buyer's right to purchase parts and vehicles, his right to use an existing floor plan, and the status he would enjoy as a dealer. That is, he went beyond simply saying that he would help the buyer if he had trouble with Harley–Davidson.

We have found no cases holding a lender liable under section 17.46(b)(12) for statements that a seller was reputable or that the lender would help make a seller perform, or for analogous statements. In the present case Home Savings said nothing to suggest the content of anyone's rights,

remedies, and obligations under the Contract of Improvement, to which it was not even a party. We respectfully disagree with the dissent's view that *Home* misrepresented the *terms* of the *Martinez–Gershenson* contract when its agent said Gershenson was reputable and that Home would remedy any defects.[3] Accordingly, we hold that the closing agent's statements that Gershenson was reputable and Home would make him cure any defects do not fall within section 17.46(b)(12), which deals only with misrepresentations of the terms of an agreement.

The Martinezes also point to Home's statements, after Gershenson had failed to perform, that it was not legally responsible. They argue that this was an incorrect statement because under 16 C.F.R. § 433.1 *et seq.,* they were entitled to assert any rights against Home that they could assert against Gershenson. But section 433.1 *et seq.* simply *preserves* a consumer's right to assert claims and defenses against a holder in due course that the consumer would be able to assert against the seller or other person that he contracted with. The Martinezes waived their section 433.2 cause of action because they did not tender jury questions to submit it. *See* TEX.R. CIV.P. 279. Had they not waived this claim, they could have recovered under section 433.2 only to the extent that they had made payments under the contract—that is, $597.20. *See* 16 C.F.R. § 433.2; *Home Savings Ass'n v. Guerra,* 733 S.W.2d at 136.

In any event, even if Home Savings had been liable to the Martinezes under section 433.2, Home's statement that it was not responsible did not constitute a misrepresentation of the terms of its contract with the Martinezes, which is what DTPA § 17.46(b)(12) forbids. In analogous cases involving insurance agreements, the courts have held that post-loss denials of liability, though erroneous, do not violate section

3. We express no opinion about the circumstances under which it may be actionable for a third party to make statements about the rights, remedies, and obligations under a contract to which it is not a party. We simply hold that in the present case Home made no representations about the "Contract for Improvements (With Transfer of Lien)" between the Martinezes and Gershenson.

17.46(b)(12). *South Texas Nat'l Bank v. United States Fire Ins. Co.*, 640 F.Supp. 278, 280 (S.D.Tex.1985); *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 922 (Tex.App. —Fort Worth 1988, writ denied); *American Ins. Co. v. Reed*, 626 S.W.2d 898, 904– 905 (Tex.App.—Eastland 1981, no writ); *General Accident, Fire & Life Assurance Corp. v. Legate*, 578 S.W.2d 505, 506–507 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.); D. BRAGG, P. MAXWELL & J. LONGLEY, TEXAS CONSUMER LITIGATION § 3.05.12, at 92–93 (2d ed. 1983). The same principle should apply to post-incident denials of liability under non-insurance contracts.

We have carefully reviewed the record for evidence of a misrepresentation concerning the terms of the Contract for Improvements.[4] Having found none, we must sustain Home's points five and six.

*3. Other contentions.*

■ The Martinezes' brief suggests that Home and Gershenson were "inextricably intertwined." After their brief was filed, however, the supreme court held that such a relationship does not make a defendant vicariously liable for the wrongful conduct of the one he is intertwined with. *Qantel Business Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 305 (Tex.1988). That is, Home is not derivatively liable for Gershenson's conduct; the Martinezes had to prove an independent DTPA violation against Home, or establish one of the "traditional common law theories of vicarious liability, such as agency or *respondeat superior.*" *Id.*

The Martinezes also state in their brief that the closing agent's statements amounted to fraud. But this independent ground of recovery was not requested or submitted to the jury and has therefore been waived. TEX.R.CIV.P. 279.

*4. Cancellation of the note.*

■ In addition to rendering judgment against Home Savings, the court cancelled

the Martinez note and declared it null and void. In other words, under the judgment Home Savings not only forfeited the $20,-000 it had loaned and paid to the Martinezes for home improvement; it was also required to pay them the cost to improve the house (an additional $20,000), together with penalties and attorney fees.

The court did not submit any jury questions on the Martinezes' request to have the note cancelled. Nor did it submit Home's tendered issues concerning its counterclaim to collect on the note. In points of error twelve and thirteen, Home challenges the trial court's cancellation of the note because the Martinezes did not prove or obtain jury findings of failure of consideration or other common law or statutory grounds. The Martinezes contend that they established their right to such relief as a matter of law on grounds that there was failure of consideration, unconscionability, and a violation of article 5069– 13.03 (home solicitation transactions).

The Martinezes did not establish their right to cancellation as a matter of law. Since the note was funded in full, failure of consideration was certainly not established. *See generally* TEX.BUS. & COM.CODE ANN. § 3.408 (Vernon 1968). We have already held that there is no evidence of unconscionability as that concept is defined by the statute and the supreme court. And since the record does not establish a violation of the Home Solicitation Transactions Act as a matter of law, and no such issues were submitted to the jury, that statute cannot support the trial court's action. For all these reasons, Home's points twelve and thirteen are sustained.

That portion of the judgment cancelling the note is reversed and remanded for a new trial. The judgment for damages is reversed and judgment rendered that the Martinezes take nothing from Home Savings.

---

**4.** We respectfully disagree with the dissent's suggestion that paragraph 8 of the contract obligated Home in any way to correct Gershenson's work. Paragraph 8 simply gave Home the *option* to complete the project and establish a lien.

Paragraph 8 says, in pertinent part: "Lender, at its option, shall have the right to complete the improvements, and the lien shall be valid for the contract price."

CHAPA, Justice, dissenting.

I respectfully dissent.

The majority has concluded that this record contains no evidence to support the jury findings that Home Savings:

1) took "advantage of the lack of knowledge, ability, experience, or capacity of [the Martinezes] to a grossly unfair degree"; and

2) "represented to the [Martinezes] that the contract of February 19, 1986, conferred or involved rights, remedies, or obligations it did not have."

I disagree.

The Texas Supreme Court set out the standard of review in such cases:

> In deciding the question of whether there is evidence of probative force to support a jury finding, we must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965).

*Brown v. Galleria*, 752 S.W.2d 114, 115–16 (Tex.1988).

The evidence and inferences in the record which tend to support the jury findings are:

1) The Martinezes met with contractor Mickey Gershenson, who assured them he would do a good job in remodeling their home.

2) Gershenson arranged for Home Savings to finance the remodeling of the Martinez' home and Home Savings prepared all the documents for the entire transaction.

3) Gershenson arranged for the Martinezes to meet him at the Home Savings office on February 19, 1986, to execute all documents for the transaction.

4) Based on a prior arrangement made by Gershenson, he and the Martinezes met at the Home office on February 19, 1986, with Home consumer loan specialist, Mary Margaret (Margo) Hernandez, who explained the transaction to the Martinezes.

5) The Martinezes had serious reservations about entering into any agreement at all, but trusted in Home Savings.

6) Home Savings through Hernandez, "in no uncertain terms" reassured the Martinezes, by misrepresenting that Home had dealt with Gershenson before, that Gershenson had a good reputation, and could be trusted.

7) Home Savings through Hernandez, further assured the Martinezes, "that [Gershenson would] do the best possible job or [Home would] see to it that if any problems occur, they will [sic] remedy."

8) Home Savings through Hernandez, also assured the Martinezes that remodeling would make their "house go up in value."

9) The Martinezes relied upon the representations of Home Savings and on February 19, 1986, executed all the transaction documents which remained with Home Savings throughout the entire period in question.

10) The documents which were prepared and discussed with the Martinezes by Home consumer loan specialist Hernandez, were executed on February 19, 1986 and included:

1) A "Notice of Intent to Improve Real Estate" wherein the Martinezes certify to HSA Service Corporation their agreement to use the money advanced by HSA Service Corporation solely for the improvement of their home.

2) A "Home Improvement Loan Application" wherein the Martinezes apply with Home Savings for a home improvement loan of $20,400.00.

3) A "Truth-in-Lending Disclosure Statement" wherein the Martinezes are notified that they will pay back $35,832.00 on the loan if all payments are met.

4) A "Contract for Improvements (with Transfer of Lien)" wherein the Martinezes and the contractor agree on a contract price of $20,000.00 and the Martinezes agree to execute a $20,400.00 note to HSA Service Corporation in consideration for HSA advancing the $20,000.00. This document is notarized by Home consumer loan specialist Mary Margaret Hernandez.

5) A "Note" executed by the Martinezes to HSA Service Corporation in the amount of $20,400.00 together with interest secured by a Deed of Trust of even date.

6) An "Assignment of Contractor Lien" which is the Deed of Trust of even date wherein the Martinezes (Borrower) and the contractor appoint *Howard C. Lee*, trustee for the Beneficiary, HSA Corporation to secure the $20,400.00 note executed by the Martinezes. The Martinezes and contractors signatures are notarized by Hernandez on the 19th of February, 1987. The same document reflects a transfer and conveyance of the Note and Deed of Trust to *Home Savings Association* by one E.R. Neatherlin, Vice President of HSA Service Corporation which is notarized by Hernandez on the 25th of February, 1986.[1]

7) A "Home Improvement Loan Authorization for Disbursement" wherein the Martinezes agreed that the proceeds from the note to Home would be used solely to pay for their home improvements and authorized the entire amount to be paid to the Martinezes and the contractor. The document is signed by the Martinezes and witnesses by Home's consumer loan specialist, who for some reason signed as "Margo Hernandez."

11) Although other clerks at Home Savings make it a practice to conduct background checks on contractors which they finance in transactions such as this, Home closing agent Hernandez failed to review the background check on Gershenson prior to making the misrepresentation to the Martinezes.

12) Home closing agent Hernandez did not deny making the alleged misrepresentations to the Martinezes, but simply could not recall making them.

13) The Contract for Improvement with transfer of lien to Home Savings provides in part:

8. **Partial Lien.** In the event the improvements are not completed by Contractor according to the plans and specifications and, for whatever reason, it is determined that Lender does not *have a lien to the extent of the full amount of the contract price, then Lender shall have a valid lien for the contract price, less the amount reasonably necessary to complete the improvements according to the plans and specifications, or in such event Lender, at its option, shall have the right to complete the improvements, and the lien shall be valid for the contract price.* (Emphasis added.)

14) When problems arose with the remodeling efforts, the Martinezes were unable to contact Home's agent Hernandez but were told by Home's agent Guerrero that Home had nothing to do with the quality of the contractor's work.

15) The remodeling work done by the contractor was incomplete and so defective that it would cost up to $24,000 to correct, and had, in fact, deteriorated the value of the Martinez' home.

16) As a result of this transaction, the Martinezes suffered mental anguish in the form of headaches, sleeplessness, embarrassment, strain on the marriage, and deterioration of their credit.

The question then is whether this evidence and its inferences are sufficient to support the jury's first finding that Home Savings took advantage of the Martinezes to a grossly unfair degree.

Defining "unconscionable action or course of action" in such cases, the Texas Supreme Court stated:

Unconscionable action or course of action is an act or practice which, to a person's detriment:

A. Takes advantage of the lack of knowledge, ability, experience, or capability of a person to a grossly unfair degree;

. . . . .

---

**1.** Hernandez testified that the transfer and acknowledgement to Home Savings Association took place on February 25, 1986 because "that's the day we get (sic) the money in the bank to cover the check that we disbursed." Further, HSA Service Corporation was a subsidiary of Home Savings Association, and E.R. Neatherlin was identified in testimony as both a Vice President of HSA Service Corporation and Home Savings Association.

TEX.BUS. & REM.CODE § 17.45(5). Taking advantage of a consumer's lack of knowledge to a grossly unfair degree requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated. *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985).

. . . . .

Some evidence under [this] definition of unconscionability will support the trial court's judgment.

*Brown v. Galleria,* 752 S.W.2d at 116.

In *Brown,* the consumer Brown, took his automobile for repairs to LaMarque Ford of Texas. While the car was being repaired, LaMarque and several individuals who ultimately incorporated as Galleria Area Ford, Inc. entered into a complicated agreement giving the potential future owners (Galleria) full managerial authority for the daily operation of the business. Brown was unaware of who owned or was running the agency that eventually failed to repair his vehicle. Apparently concluding there was no evidence that Galleria had misrepresented anything about the repairs to Brown's vehicle directly to Brown, the court of appeals reversed the jury findings in favor of Brown as to Galleria on a no evidence contention.

In finding that there was indeed some evidence to support the jury finding against Galleria, the Texas Supreme Court said:

> It is important to note that the Browns were never apprised of this complicated arrangement between LaMarque and Galleria. During trial, Mr. Brown testified that he did not know who owned the Ford dealership at the time he discovered all the problems with the repair work on his truck. The evidence adduced at trial revealed that while the truck was being repaired, the phone at the dealership was answered "Galleria Ford." In addition, during this same time period, persons employed at Galleria told one of the Browns' witnesses with respect to the change of the dealership: 'We are the same happy folks ... here to help you but we changed names ... [E]verything

else [is] the same.' In light of the evidence presented by the Browns, we conclude that in representing itself to the public and to the Browns as the new company in charge of the dealership, Galleria took advantage to a grossly unfair degree of the internal working relationship and agreements that allocated responsibility and liability between themselves and LaMarque.

*Brown* at 116–17.

The majority here correctly recognizes that this court is obliged to consider only the evidence and inferences that support the jury findings and disregard all evidence and inferences to the contrary. They further recognize the misrepresentations of Home to the Martinezes and the consequences thereof. Nevertheless, the majority comes to the extraordinary conclusion that there is no evidence in the record to support the jury finding that Home Savings engaged in any unconscionable conduct. The majority has misplaced their reliance on *Chastain v. Koonce,* 700 S.W.2d 579 (Tex.1985) to reach such a holding.

In *Chastain,* the purchasers of some lots brought an action against the vendor alleging unconscionable conduct to their detriment. They contended that the vendor violated his representation which induced them to buy, by making commercial use of a lot in an area he had lead them to believe would be for residential use only. The purchasers further complained that the vendor, at some time after the purchases, had made threats against the buyers for causing him trouble over the lots.

In concluding that there was no evidence to uphold a finding of unconscionable conduct on the part of the vendor, the Texas Supreme Court was careful to note initially that no damages were shown by the purchasers with regard to the purchased lots:

> Under the facts of our case, the purchasers failed to show any disparity between the value received and the consideration paid in the transaction. The record is devoid of any expert testimony relating to the value of the property at the time of the purchase. In addition,

among the purchasers only Gary Chastain testified as to the consideration paid for the property. The only relevant testimony concerning land values in the record is expert testimony which explains the value at the time of trial and the land would have attained had the pipeyards not been placed on lot 2. These values were far in excess of the amount which Gary and Georgia Chastain paid for their lot.

*Chastain* at 582.

The supreme court then made it clear that you can't have "resulting unfairness to a grossly unfair degree" if there is no showing of resulting injury directly attributable to the unconscionable acts themselves:[2]

> Taking advantage of a consumer's lack of knowledge to a grossly unfair degree thus requires a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated. Based on the record as a whole, we find no evidence that the Chastains and the other three couples were taken advantage of to a grossly unfair degree.
>
> The purchasers emphasize the telephone conversation between Gary Chastain and J.P. Stroud, in which Stroud threatened physical violence and to place a rubber burning plant in the vicinity of Gary Chastain's land. We find this unpersuasive. The phone conversation occurred approximately *one year* after the alleged misrepresentations occurred and do not reflect on the unfairness of the original transaction between the purchasers and Koonce and Stroud. As a result, we find no evidence of unconscionability.

*Chastain* at 584.

However, *Chastain* is clearly distinguishable from the case before us. Where the buyers in *Chastain* failed to show any resulting damages from the unconscionable acts of the sellers, the consumers here (Martinez) have presented abundant evidence that they were damaged grossly by the unconscionable acts of Home Savings. It cannot be seriously argued that the damages suffered by the Martinez which resulted directly from the unconscionable acts of Home Savings, are anything but glaringly noticeable, flagrant, complete and unmitigated.

The majority would just simply ignore any evidence in the record of gross disparity between the $35,832.00 debt incurred by the Martinezes and the incomplete defective remodeling received by the Martinezes because the appellees did not pursue findings as to gross disparity. Because appellees did not pursue such findings directly is no justification to ignore this evidence when being obligated to consider this evidence and its inferences as a factor in determining if the "resulting unfairness" of Home Savings unconscionable acts took advantage of appellees to a grossly unfair degree.

The majority rejects appellees' "inextricably intertwined" argument erroneously concluding that such an argument is unavailable to appellees because appellees have failed to establish an independent DTPA violation against Home. I disagree. Further, the majority fails to focus on the totality of the transaction in suggesting that there is no room for a disparity argument because of their erroneous conclusion that there is no connection between the relationship of the Martinezes and the contractor and the Martinezes and Home.

In so doing, the majority ignores the clear, uncontradicted and documented evidence 1) that the sole purpose of this loan was to pay the contractor to remodel the Martinezes home, 2) that it was Home who orchestrated the entire transaction by preparing, explaining, executing, notarizing, and witnessing all the documentation in-

---

**2.** We note that the language of § 17.45(5), Ch. 17 DTPA reads:

§ 17.45 Definitions.

.    .    .    .    .

(5) "Unconscionable action or course of action" means an act or practice which, *to a person's detriment* (emphasis added) ...

It thus is logical that before such an act is actionable, it must be to the consumer's detriment which requires a showing of some damage.

volved, 3) and that it was Home's misrepresentation that induced the Martinezes to enter into the entire agreement which resulted to their detriment.

Regardless of what may or may not have been argued, the jury here apparently saw this whole thing as one transaction with one purpose; a joint effort by Home and the contractor to induce the Martinezes to borrow the money from Home to pay the contractor without concern for the consequences to the Martinezes. The jury believed that Home's misrepresentation to the Martinezes in the process of inducing them, was a proximate cause of the Martinezes damages, and the evidence and inferences supports their findings.

Contrary to the majority's opinion, *Brown* is more controlling here. In fact, the evidence in this case which established the unconscionable acts of the alleged violator is more glaringly noticeable, flagrant, complete and unmitigated than in *Brown*. Where in *Brown*, there was no evidence that Galleria directly misrepresented anything to Brown about his car's repair, there is abundant evidence in this record of Home's direct misrepresentation to the Martinezes which resulted to their detriment. The majority argues that *Brown* is too distant to our case because of the lack of evidence of secret arrangements between Home and the contractor as in *Brown*. But it cannot be denied that the record shows that Home and the contractor had prior dealings and that their joint efforts, which gained them both a profit, put the Martinezes in the unenviable position they now occupy.

Recently, in *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670 (Tex.1989), the Texas Supreme Court reversed the court of appeals on a no evidence contention in a similar case:

In determining a "no evidence" question, however, a court must consider only that

evidence and reasonable inferences therefrom that tend to support the jury findings, disregarding all contrary evidence and inferences. *King v. Bauer*, 688 S.W.2d 845 (Tex.1985). Here, as the court of appeals conceded, there is evidence "that Ryan misrepresented the status that Best would enjoy as a Harley-Davidson dealership, including the ability to buy parts and vehicles." [*Best v. Ryan Auto Group*] 768 S.W.2d 956 at 957 [ (Tex.App.—Fort Worth 1989) ]. More specifically, Best testified that Ryan misrepresented to him at the time of sale that he would "be able to buy parts and vehicles as Mr. Ryan has been buying." Clearly, this is some evidence from which the jury could reasonably conclude that Best purchased the dealership with the specific understanding that he would be able to purchase inventory as needed from Harley-Davidson and, therefore, that Ryan's misrepresentation was a producing cause of Best's subsequent damages. The court of appeals' opinion is therefore in conflict with our holding in *King v. Bauer, supra*.

*Best* at 671–72.

As in *Best*, the majority here concedes that "the record contains testimony by Mrs. Martinez that Home's closing agent, Margo Hernandez, assured her that Gershenson was reputable, that he could be trusted, that Home would make him cure any problems that arose,[3] and that remodeling would increase the value of the house and therefore would be better than buying a new house. The record also shows that Home Savings did not correct Gershenson's poor workmanship and that the closing agent was not familiar with his reputability. Mr. and Mrs. Martinez were having second thoughts about entering the transaction, and Home's reassurances convinced them to enter the contract with Gershenson." The evidence further shows that the

---

**3.** The actual testimony which the jury apparently believed in this respect was that Home misrepresented to the Martinezes "that [the contractor would] do the best possible job or [Home would] see to it that if any problems occur, they will [sic] remedy."

This is a far cry from the suggestion of the majority that Home simply said that they would help the Martinezes if they had any trouble with the contractor. The deception was in misleading the Martinezes to believe that the transaction documents provided for Home to remedy any defects created by the contractor.

net result to the Martinez was a $35,832.00 debt to Home Savings and an incomplete substandard remodeling effort to their home which would cost $24,000.00 to remedy, and a home with a reduced value.

As in *Best*, this certainly was some evidence from which the jury could reasonably conclude that the Martinezes indebted themselves to Home Savings because of Home Savings' misrepresentation and with the understanding that Home Savings would remedy any defects in the contractor's work. From the evidence, the jury could reasonably conclude that Home's misrepresentations were a producing cause of Martinez' subsequent damages.

Therefore, as in *Best*, the majority opinion here is in conflict with the holding of the Texas Supreme Court in *King v. Bauer*, 688 S.W.2d 845 (Tex.1985). I would hold that there is abundant evidence in this record to sustain the jury's first finding that Home took advantage of the lack of knowledge, ability, experience, or capacity of the Martinez to a grossly unfair degree. This finding was sufficient to support the court's judgment.

However, I would further disagree with the majority's holding that there is no evidence in this record to sustain the jury's second finding: that Home "represented to the [Martinezes] that the contract of February 19, 1986, conferred or involved rights remedies or obligations it did not have."

The favorable evidence and inferences in the record set out above as supporting the jury's first finding likewise support the jury's second finding.

Considering the evidence and its inferences, it was reasonable for the jury to believe the Martinezes were mislead and deceived by Home that the documents of the transaction provided that Home would remedy any defects in the construction; and that Home, as the Lendor, would exercise its option under Paragraph 8 of the Contract for Improvements with Transfer of Lien by completing the improvements, and correcting any defects. The majority justifies ignoring this evidence by simply asserting that the Martinezes failed to pursue a cause of action for breach of a verbal contract against Home. This assertion does not change the existence of this evidence and inferences in this record which also supports this jury finding. Therefore, I would hold that the jury finding that Home represented to the Martinezes that the contract conferred or involved rights, remedies, or obligations it did not have was likewise supported by evidence and inference in this record.

The majority would deny these consumers relief because some inculpating words are missing in the misrepresentations made. The majority would require that the misrepresentations of the lender *specifically* state that the written contract *specifically* gave the consumer *specific* rights it did not have in order to establish liability. Such a holding would mean, that any potential violator of the DTPA would be free from liability by falsely inferring, suggesting, insinuating, intimating, or implying anything about a contract as long as no specifics are used. This would violate both the purpose and spirit of the DTPA emphatically recognized by the Texas Supreme Court:

> The central purpose of the DTPA is the protection of consumers against false, misleading, and deceptive business practices, and unconscionable actions.

*Brown v. Galleria*, 752 S.W.2d at 117. For it is the act of falsely inferring, suggesting, insinuating, intimating or implying that misleads and deceives the consumer and it is for juries, as the fact finders, to decide whether the actions of an alleged violator have reached such a point. Here, the jury found the acts of Home Savings reached that point and the evidence and inferences in this record support such findings.

The majority appears to conclude that although Home Savings wronged the Martinezes, they did not wrong them enough; that although the Martinezes were damaged by Home's wrongs, they were not damaged enough. During a more primitive period of Texas law, "Buyer Beware" was the standard policy which left all consumers without any real rights. The DTPA ended that standard, creating new rights

and protections for the weary consumer; any eroding of these rights would violate the central purpose of the Act.

I am not convinced that the standard of review for a no evidence point is different when dealing with these types of cases. However, in the event that it is, I am convinced that the favorable evidence and inferences in this record support all the findings of the jury to a sufficient degree to affirm the judgment of the trial court.