HOW INSURANCE COMPANY, et al., Appellants,

v.

PATRIOT FINANCIAL SERVICES OF TEXAS, INC., et al., Appellees.

No. 3–89–042–CV.

Court of Appeals of Texas, Austin.

March 21, 1990.

Jerry D. Porter, Rash, Laney, Chapman & Schreiber, Bruce Hardesty, Gray & Becker, and Debora McWilliams, Thompson & Knight, Austin, for appellants.

Stephen P. Redgate, Winstead, McGuire, Sechrest & Minick, Dallas, for appellees.

Before SHANNON, C.J., and SMITH * and JONES, JJ.

## ON MOTION FOR REHEARING

JONES, Justice.

The opinion issued by this Court on January 17, 1990, is withdrawn, and the following is substituted therefor.

This is an appeal from a suit involving misrepresentations in the sale of a condominium unit. The purchaser of the condominium, Jebron Hopper, sued the builders and owners of the condominium complex, Far West Skyline Development Joint Venture ("Far West") and Gary Caywood-Anderson, Inc. ("GCAI"), the providers of the homeowners' warranty and insurance, Home Owners Warranty Corporation and HOW Insurance Company (collectively "HOW"), and other defendants which have now settled with the plaintiff and been dismissed from this appeal. The jury returned a verdict in favor of Hopper based on the Deceptive Trade Practices Act (DTPA), Tex.Bus. & Com.Code Ann. §§ 17.-41–17.63 (1987), common law fraud, and statutory fraud involving the sale of real estate, Tex.Bus. & Com.Code Ann. § 27.01 (1987). The trial court rendered judgment on the jury's findings, except that the court disregarded one finding of actual damages and ordered that Hopper take nothing as to those damages. All of the parties named above perfected separate appeals to this Court. Hopper appeals from the take-nothing judgment n.o.v., and the remaining parties appeal from the judgment on the jury's

verdict. We will affirm the judgment n.o.v. and the judgment against Far West and GCAI, and we will reverse the judgment against HOW and remand as to those parties.

## I. Factual Background

In 1984 Jebron Hopper purchased a condominium unit in the Far West Skyline Condominiums for $97,650. The condominium complex was owned by Far West, which was a joint venture consisting of GCAI and Patriot Financial Services of Texas, Inc. GCAI was also the builder and general contractor for the complex. In connection with her purchase of the condominium, Hopper received a homeowner's warranty and a certificate of insurance from HOW.

During negotiations prior to her purchase of the unit, Hopper was given a brochure that, in part, described the condominium complex as featuring "meticulous construction." Soon after moving into her condominium, Hopper began experiencing numerous problems with the finish out and construction of the unit. She complained to GCAI, which repaired some but not all of these problems. The most serious problem was caused by water intrusion resulting from faulty construction of the complex, which eventually led to wood rot in the exterior wall of Hopper's unit.

Because GCAI was unable to complete the repairs of the water intrusion damage, Hopper filed a claim with HOW. HOW initially denied the claim, asserting that it was not timely filed. Eventually, HOW conceded that the claim was timely. When HOW became aware of the nature and extent of the structural problems, the wood rot and water intrusion, HOW assured Hopper that if GCAI did not repair the problem, HOW would perform the repairs under the warranty.

After numerous attempts to repair the problem, the exterior wall of Hopper's unit was removed and replaced with sheets of

---

* Before Earl W. Smith, Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex.Gov't Code Ann. § 74.003 (1988).

plastic. HOW offered an amount to repair the interior of Hopper's unit, but would not pay to replace the exterior wall because, by this time, HOW had become aware that the water intrusion problem affected the entire complex. Eventually, HOW negotiated a settlement with the Far West homeowners association to repair the damage to the common elements of the complex, including Hopper's exterior wall. However, by the time of trial (more than two years after Hopper's exterior wall had been removed) the repair to the common elements had not been performed and the plastic sheeting remained on Hopper's unit.

At trial, the jury found that Far West, GCAI, and HOW had committed violations of the DTPA. In addition, the jury found that Far West and GCAI had committed common law fraud and statutory fraud in connection with the sale of real estate. The jury found $87,650 in compensatory damages and $75,000 in mental anguish damages against Far West, GCAI, and HOW. In addition, the jury awarded Hopper $200,000 in exemplary damages against Far West and GCAI and $100,000 in exemplary damages against HOW. The trial court rendered judgment n.o.v. against Hopper as to the $87,650 compensatory damages, but rendered judgment in Hopper's favor for the remaining actual damages, exemplary damages, other stipulated damages, attorney's fees, and prejudgment interest.

## II. HOW's Appeal

■ HOW complains that the trial court erred in denying its plea in abatement and in rendering judgment on the DTPA cause of action because Hopper failed to provide the required pre-suit notice to the defendants. The operative statutory mandate for notice under the DTPA provided:

> As a prerequisite to filing suit ... a consumer shall give written notice to the person at least 30 days before filing the suit advising the person of the consumer's specific complaint and the amount of actual damages and expenses, including attorneys' fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant.

1979 Tex.Gen.Laws, ch. 603, § 5, at 1330 [Tex.Bus. & Com.Code § 17.50A(a), since amended and renumbered as § 17.505(a)].

■ In order to comply with this provision, the notice must be in writing and must meet the specific requirements of the statute. *Blumenthal v. Ameritex Computer Corp.*, 646 S.W.2d 283, 287 (Tex.App. 1983, no writ). The burden to plead and prove compliance with the notice provision rests on the party seeking recovery. *Investors, Inc. v. Hadley*, 738 S.W.2d 737 (Tex.App.1987, writ denied). However, the party seeking to deny recovery must point out the failure to plead or prove notice, or the complaint is waived. *Id.; Silva v. Porowski*, 695 S.W.2d 766 (Tex.App.1985, writ ref'd n.r.e.).

HOW preserved its complaint as to the notice requirements. HOW specifically presented the notice issue to the trial court in its answer, special exceptions to Hopper's pleadings, plea in abatement, objections to the jury charge, and motion for new trial.

The record in the present case fails to show that Hopper satisfied the pleading or proof requirements necessary for proper notice. Hopper argues that her pleadings are sufficient under Tex.R.Civ.P.Ann. 54 (1979). *See Investors, Inc.*, 738 S.W.2d at 742. Hopper's fifth amended petition includes a cause of action for breach of warranty, which alleges that "[a]ll conditions precedent have occurred which are necessary for the performance by the [defendants] of their obligations in the warranty and the insurance policy." At most, this pleading alleges that all conditions precedent to HOW's performance *on the warranty* have been satisfied; it does not sufficiently allege that the requisite DTPA notice was given. Further, Hopper offered no proof at trial that any notice had actually been given.

Even if Hopper could overcome these pleading and proof deficiencies, she would still be unable to prove compliance with the notice provisions. In her brief, Hopper states that her demand letter was received by the defendants on October 3, 1986, the

same day the DTPA suit was filed. Therefore, even if Hopper had pled notice and proved delivery of the notice letter, she would not have complied with the notice requirements because, by her own admission, notice was not given thirty days before filing suit.

■ On appeal, Hopper argues that she was not required to serve notice of the claim because the limitations period was about to expire. *See Russell v. Campbell,* 725 S.W.2d 739, 746 (Tex.App.1987, writ ref'd n.r.e.). It is true that the DTPA did not require a consumer to serve the notice "[i]f the giving of 30 days' written notice is rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations." 1979 Tex.Gen.Laws, ch. 603, § 5, at 1330 [Tex.Bus. & Com.Code § 17.50A(b), since amended and renumbered as § 17.505(b) ]. However, in order to qualify for this exception when notice has been specifically denied, a plaintiff must plead and offer some proof that the giving of notice was "rendered impracticable" by the impending expiration of the limitations period. Since HOW expressly denied notice, Hopper had the burden of pleading and proving the exception if she wanted to rely on it. Here, Hopper pleaded and proved neither the exception nor compliance with the notice provisions.

■ We conclude that Hopper's failure to plead and prove the required DTPA notice is reversible error; therefore, the trial court erred in denying HOW's plea in abatement. *See Star–Tel, Inc. v. Nacogdoches Telecommunications, Inc.,* 755 S.W.2d 146, 149 (Tex.App.1988, no writ). After reviewing the relevant authorities, some of which are in conflict, we conclude that the appropriate remedy is to remand the case for a new trial on the DTPA cause of action with instructions to the trial court to abate the suit to allow Hopper to comply with the notice requirement. *See Certainteed Corp. v. Cielo Dorado Dev., Inc.* 733 S.W.2d 247 (Tex.App.1987), rev'd on other grounds, 744 S.W.2d 10 (Tex.1988); *Sunshine Datsun, Inc. v. Ramsey,* 680 S.W.2d 652 (Tex.App.1984, no writ); *see also*

*Schepps v. Presbyterian Hospital,* 652 S.W.2d 934 (Tex.1983). *But see Hollingsworth Roofing Co. v. Morrison,* 668 S.W.2d 872 (Tex.App.1984, no writ) (holding that where the required notice was not given and the action was not abated prior to trial, the proper remedy was to allow the plaintiff recovery of actual damages, but deny treble damages and attorney's fees).

The obvious rationale behind the DTPA's notice requirement is, at least in part, to encourage settlements and give potential litigants an opportunity to avoid the costs of litigation. HOW has already incurred its *own* attorney's fees for one trial in this matter, and no one suggests that Hopper should reimburse HOW for those fees. However, at this stage of the litigation (i.e., starting over), HOW should not be held responsible for all of *Hopper's* attorney's fees. Therefore, we deem it appropriate to note that, on remand, Hopper's DTPA notice letter may not properly demand that HOW reimburse her for her expenses incurred in connection with any aspect of this lawsuit, from filing through appeal. Hopper may, of course, demand reimbursement for pre-suit expenses, including attorney's fees.

HOW has raised other points of error, some of which would, if sustained, require this Court to render judgment in its favor. Therefore, we will review HOW's rendition points.

■ HOW contends in its second point of error that Hopper cannot recover from HOW under the DTPA because Hopper is not a "consumer" as defined by the statute. The DTPA defines "consumer" as "an individual, partnership, corporation, ... who seeks or acquires by purchase or lease, any goods or services." Tex.Bus. & Com.Code Ann. § 17.45(4) (1987). The test for consumer status is two-pronged: first, the complainant must have sought or acquired goods or services by purchase or lease; second, the goods or services purchased or leased must form the basis of the complaint. *Melody Homes Mfg. Co. v. Barnes,* 741 S.W.2d 349, 351–52 (Tex.1987).

Whether a plaintiff is a consumer under the DTPA is generally a question of law to be determined by the trial court from the evidence. *Reed v. Israel Nat'l Oil Co.*, 681 S.W.2d 228, 233 (Tex.App. 1984, no writ). When the trial court submits a jury issue on DTPA violations, the court has implicitly determined that the complainant is a consumer under the Act. *Holland Mortgage & Inv. Corp. v. Bone*, 751 S.W.2d 515, 517 (Tex.App.1987, writ ref'd n.r.e.).

Relying on the fact that under the warranty the only named insureds are the builder, developer, Home Owners Warranty Corporation, and the local council of Home Owners Warranty, HOW asserts that Hopper failed to meet the first prong of the above test: she did not seek or acquire goods or services by purchase or lease because she was not in privity with HOW. We disagree. As the Texas Supreme Court stated in *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983),

> Privity between the plaintiff and defendant is not a consideration in deciding the plaintiff's status as a consumer under the DTPA. [Citations omitted.] A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant.

The present record provides sufficient evidence from which the trial court could reasonably conclude that Hopper was a consumer in this transaction. Under the terms of the warranty, the builder was the warrantor and was primarily responsible for making repairs. HOW's obligations under the warranty were to administer the warranty program and to insure the performance of the builder as warrantor. Insuring another's performance is a "service" as defined by the DTPA. *See McCrann v. Klaneckey*, 667 S.W.2d 924, 926 (Tex.App.1984, no writ). Hopper acquired the services provided by HOW when she purchased the condominium. That Hopper did not personally purchase the insurance is of no consequence. The consumer does not have to be the actual purchaser of the insurance in order to be clas-

sified as a consumer under the DTPA. *See Kennedy v. Sale*, 689 S.W.2d 890 (Tex. 1985). The builder purchased the warranty policy from HOW to serve as an inducement to potential purchasers of the condominiums. In the warranty, HOW recognizes that the primary beneficiary of the insurance is the purchaser of the condominium. Therefore, Hopper's relationship to the purchase of the insurance from HOW is sufficient to give Hopper standing as a consumer under the first prong of the test.

HOW also argues that Hopper is not a consumer because Hopper failed to show that the services she acquired from HOW formed the basis of her complaint. We disagree. Hopper's complaint against HOW relates to HOW's performance as the administrator of the warranty program and as the insurer of the warrantor. These are the very "services" that Hopper acquired from HOW. Therefore, the services Hopper acquired from HOW did form the basis of her complaint. We conclude that the trial court did not err in finding Hopper to be a consumer under the DTPA. HOW's point of error two is overruled.

The remainder of HOW's rendition points are no-evidence challenges to the jury's findings. In considering "no evidence" points, we reject all evidence contrary to the jury's findings and consider only the facts and inferences that tend to support those findings. *Renfro Drug Co. v. Lewis*, 149 Tex. 507, 235 S.W.2d 609 (1950).

In its third point of error, HOW complains that the trial court erred in submitting questions concerning misrepresentation and unconscionability to the jury because there is no evidence to support these issues. If the DTPA judgment can be supported on either misrepresentation *or* unconscionability, we need not render judgment for HOW. Since we conclude that the evidence adequately supports the jury's finding of unconscionability, we will address only that issue.

Unconscionability under the DTPA is defined as follows:

> "Unconscionable action or course of action" means an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

Tex.Bus. & Com.Code Ann. § 17.45(5). *See also Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985) (holding that subdivision A of section 17.45(5) requires the resulting unfairness to be "glaringly noticeable, flagrant, complete and unmitigated").

Hopper purchased her unit in February 1984 and received the HOW warranty as part of the transaction. On March 27, 1985, Hopper sent a letter to HOW through the local builder's council, informing HOW of the defects in the unit. In response HOW denied coverage because the claim was not timely filed. Hopper replied that she had timely given notice, albeit to the wrong party, and she informed HOW that the windows in her unit were inoperable and the window sills were damaged. HOW then admitted timely notice.

Thereafter, HOW commenced a "dispute settlement record" and concluded that the window problem was the builder's responsibility. HOW directed the builder to repair the problems within 60 days. At the end of the 60 days, the builder had not completed the repairs. Hopper, frustrated by the lack of results, called both the builder and HOW in an effort to effect the repairs. In December, HOW completed a compliance report showing that the problems had not been remedied.

On March 12, 1986, the builder removed the windows in Hopper's unit, exposing some wood rot in the exterior walls of the unit. Hopper notified HOW, which told her that the builder could not just replace the windows, but also had to fix the source of the problem, the water leak. The builder replaced the windows but left gaps on the sides of the windows, allowing water to "pour" into Hopper's unit. Hopper notified HOW of these ongoing problems.

After months of negotiations, Hopper agreed to forego enforcing the warranty and allow the builder to repair the unit. HOW indicated to Hopper that as long as the builder was willing to work on the problem she should allow them to continue. In July 1986, the builder replaced the windows, but the water problem persisted. The builder then removed the exterior wall, exposing severe wood rot in the wall. Hopper called HOW, notifying it of the structural damage. HOW told Hopper not to worry, that the problem would be solved, if not by the builder then by HOW. Thereafter, the builder ceased repair efforts. Hopper again notified HOW, which told her not to worry, that HOW would take over the repairs, and that once HOW took over the builder could no longer attempt repairs. In late July, HOW sent inspectors to examine the problem.

After hearing nothing, Hopper wrote to HOW on September 16, 1986, to inquire about the repairs. In response she received a phone call in which HOW agreed to pay for replacement of the windows, but not to fix the exterior wall. The HOW representative stated initially that HOW denied coverage because the damage was caused by water seepage not resulting from a construction defect. When Hopper explained that the source of the water leak was indeed a construction defect, the representative stated that HOW denied coverage on the ground that the water leak was in the unit above Hopper's, and since the occupant of that unit had not filed on the warranty, the problem was not covered. When Hopper explained that no damage had occurred in the other unit, the representative stated that HOW denied coverage because the exterior wall was a common element, not covered by Hopper's warranty.

HOW followed up this phone conversation with a letter stating that it would replace the windows, but that it was denying coverage as to the water leak and the wood rot. HOW stated it was denying coverage as to the water leak because the leak occurred in another unit and because the leak was not discovered within the duration of the warranty. HOW stated that it was denying coverage as to the wood rot

because it was excluded from coverage as a "consequential damage." The letter did not mention the exterior wall being a common element.

In order for us to conclude that there is some evidence of unconscionability here, we must determine if HOW unfairly took advantage of Hopper, and if this unfairness was "glaringly noticeable, flagrant, complete and unmitigated." *Chastain*, 700 S.W.2d at 584. Furthermore, we must determine if there is some evidence that HOW's unconscionable acts were a producing cause of Hopper's damages.

HOW, as warrantor and insurer, was in a better position than Hopper to have a detailed understanding of the extent of coverage and the procedural aspects of Hopper's homeowner's policy. Similarly, because of its close ties to the builder and the construction industry, HOW was in a better position to know and understand the facts surrounding the problems with Hopper's unit. We conclude that the evidence set out above supports, in a variety of ways, the jury's finding that HOW took advantage of Hopper's lack of knowledge and understanding. For the sake of brevity, we will look at only some of HOW's conduct, which we feel sufficiently demonstrates unconscionability.

The record contains some evidence that HOW used its superior knowledge of the homeowner's warranty to lull Hopper into inaction concerning the repairs. HOW knew, by at least March 12, 1986, that the exterior wall of Hopper's unit was damaged by wood rot. It is a reasonable inference that HOW also knew or should have known that it would claim that this damage was not covered by the warranty. Instead of being candid with Hopper about the extent of coverage of the warranty, however, HOW dissuaded her from taking action on her own by promising her that everything would be repaired, either by the builder or by HOW itself. The evidence supports the inference that, when Hopper pressed HOW to make good on its promises, HOW apparently searched through the warranty exclusions to find a way to escape liability.

HOW argues that Hopper read the warranty and, therefore, should have understood the terms of coverage and known that HOW would inevitably deny coverage. However, in making this argument, HOW ignores the fact that the warranty is a mass of legal terms and concepts, apparently not readily comprehensible even to HOW itself. For example, the warranty defines "common elements" as including "elements of enclosure." With this definition, according to HOW, Hopper should have known that windows would not be considered to be common elements, whereas an exterior wall would be so considered. The record also shows that HOW itself was apparently not sure of the extent of coverage. Each time it asserted an exclusion that Hopper demonstrated to be inapplicable, HOW resorted to yet another exclusion, eventually denying coverage because the damage was a "consequential damage," with no further explanation. Clearly, these actions made Hopper's task in asserting her claim much more difficult.

HOW argues that any misleading representation made to Hopper is not actionable under *Royal Globe Insurance Co. v. Bar Consultants, Inc.*, 577 S.W.2d 688, 694 (Tex.1979), because there is no evidence that the representation caused Hopper any damages. Had the judgment not awarded Hopper damages for mental anguish, *Royal Globe* might be dispositive. However, there is some evidence that Hopper's mental anguish damages resulted from having to live in a defective condominium that failed to protect her belongings from the elements, failed to offer her a minimum of privacy, and failed to live up to her justifiable expectations. HOW, by lulling Hopper into inaction through promises that it would take care of everything, protracted the time in which Hopper remained in the damaged unit. Each day that Hopper remained in the unit because of her belief that the unit would be repaired—a belief founded on HOW's assurances—arguably added to her mental anguish. This is at least some evidence that HOW's actions were a producing cause of Hopper's mental anguish damages. *See Kennemore v. Bennet*, 755 S.W.2d 89, 92 (Tex.1988). Further,

Hopper testified that the entire ordeal added to her mental anguish. Part of this ordeal included being treated unfairly by HOW.

We conclude that the record contains at least some evidence that HOW took advantage of Hopper's lack of knowledge, experience, and capacity to a grossly unfair degree. The no-evidence portion of HOW's third point of error is overruled.

HOW asserts in point of error four that there is no evidence to support the jury's finding that HOW's wrongful conduct was a producing cause of Hopper's injuries. There is, however, evidence that HOW acted to delay the repair while continuing to assure Hopper that HOW would take care of the repairs, and there is evidence that HOW's mismanagement and delay in making repairs contributed to Hopper's mental anguish. We conclude that this is some evidence to support the jury's finding of producing cause. We overrule the no-evidence portion of point of error four.

HOW complains in point of error five that there is no evidence to support the jury's finding that HOW's actions were committed knowingly. "Knowingly" is defined in the DTPA as:

[A]ctual awareness of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim ... but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

Tex.Bus. & Com.Code Ann. § 17.45(9). Based on the acts described above, we hold that the record contains sufficient evidence of objective manifestations from which the jury could reasonably infer actual awareness. The no-evidence portion of point of error five is overruled.

In its sixth, seventh, and eighth points of error, HOW complains that the trial court erred in awarding damages for mental anguish. The award was based on a jury finding that Hopper suffered mental anguish damages in the amount of $75,000. HOW complains on three grounds: first, that there is no evidence to support the jury's finding of mental anguish; second,

that Hopper failed as a matter of law to mitigate her damages; and third, that mental anguish damages cannot be recovered in the absence of other economic or physical harm.

■ In order to establish mental anguish a plaintiff must show more than mere worry, anxiety, vexation, embarrassment, or anger. *Roberts v. U.S. Home Corp.*, 694 S.W.2d 129 (Tex.App.1985, no writ). As the court in *Roberts* stated:

The term "mental anguish" implies a relatively high degree of mental pain and distress. It is more than mere disappointment, anger, [resentment], or embarrassment, although it may include all of these. It includes a mental sensation of pain resulting from such painful emotion[s] as grief, severe disappointment, indignation, wounded pride, shame, despair and/or public humiliation.

694 S.W.2d at 136 (quoting *Trevino v. Southwestern Bell Telephone Co.*, 582 S.W.2d 582, 584 (Tex.Civ.App.1979, no writ)).

■ In the present case, Hopper testified to the distress she suffered as a result of the problems with the condominium and the difficulties in obtaining repairs. She testified that she was "distressed" by the constant leaking of water into her condominium; that she had lived under constant pressure trying to get the problems fixed; that she had to live without any privacy or security; that people had broken into her condominium; and that she had been unable to use the condominium as a home. In addition, her uncle, Stanford Stiles, testified that the experience of living with the condominium's problems caused Hopper to become more emotional, defensive, subdued, and lethargic. We conclude that the above constitutes more than a scintilla of evidence that Hopper suffered compensable mental anguish.

HOW next argues that Hopper failed to mitigate her mental anguish damages because she refused to accept HOW's settlement offer and proceeded to trial. However, the evidence indicates that Hopper suffered mental anguish as a result of

HOW's unconscionable actions *before* the first offer of settlement. Therefore, even assuming HOW is correct as to Hopper's failure to mitigate, there is at least some evidence of mental anguish for which Hopper would be entitled to recover.

 Finally, we find HOW's argument that mental anguish damages are not recoverable in the absence of other economic or physical harm to be without merit. First, the continued viability of the Supreme Court's holding in *Luna v. North Star Dodge Sales, Inc.*, 667 S.W.2d 115 (Tex.1984), that mental anguish damages may be recovered in a DTPA action only when the wrongful conduct at issue is committed "knowingly" is in question in light of that court's later recognition of a tort of "negligent infliction of mental anguish" in *St. Elizabeth Hospital v. Garrard,* 730 S.W.2d 649 (Tex.1987). We view the argument that mental anguish damages cannot be recovered in a DTPA case absent other "economic" injury as being inconsistent with the rationale for the elimination of the "physical manifestation rule," as expressed by the Supreme Court in *St. Elizabeth Hospital.* Second, even if *Luna* is still good law, we have upheld the jury's finding that HOW acted knowingly. *See Kold–Serve Corp. v. Ward,* 736 S.W.2d 750, 754 (Tex.App.1987), writ dism'd, 748 S.W.2d 227 (Tex.1988). We overrule HOW's point of error eight and the no-evidence portions of points of error six and seven.

The remainder of HOW's points of error, even if sustained, would require only a remand, not rendition of judgment in HOW's favor. Therefore, we need not address them.

## III. Far West's Appeal

Like HOW, defendants Far West and GCAI complain that the trial court erred in rendering judgment on the DTPA cause of action because Hopper failed to give the required statutory notice. Unlike HOW, however, there are other causes of action against Far West and GCAI—namely, statutory and common law fraud—on which the trial court's judgment can rest. Because we conclude that Hopper's statutory fraud cause of action is sufficient to support the judgment, we will address only Far West's points relating to that claim.

A party may recover under a statutory fraud cause of action by showing that a false representation of material fact was made to induce the person to enter into a contract, and that it was relied on by that person in entering into the contract. Tex. Bus. & Com.Code Ann. § 27.01.

Far West and GCAI complain in their first point of error that there is no evidence or insufficient evidence to support the jury findings of misrepresentation and reliance. The representations made to Hopper concerning the purchase of the condominium were made in a brochure advertising the condominiums, which was given to Hopper on her first visit to the condominium complex. The brochure, a multi-page, full-color booklet entitled "Far West Skyline Luxury Condominiums," contained the following excerpt:

Only a select few will have the privilege of coming home to Far West Skyline. Its breathtaking views, prestigious location, and meticulous construction and design make it an enviable residence and good sterling investment....

 To be actionable, whether under statutory or common law fraud, a representation must ordinarily have been a statement of a past or existing fact, as distinguished from a mere opinion, judgment, probability, or expectation. *Ryan v. Collins,* 496 S.W.2d 205 (Tex.Civ.App.1973, writ ref'd n.r.e.). *But cf. Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983). Far West and GCAI argue that the representation in the brochure that the condominium was of "meticulous construction" was not truly a representation of fact, but was mere puffery or sales talk. However, representations as to the quality of goods, even if only a general description of the quality of goods, may be actionable representations. *See Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980) ("Words like 'excellent' and 'perfect' are words indicating a high degree of quality" and are actionable); *see also Short v. Mitchell,* 454 S.W.2d 285 (Tex.Civ.App.1970, writ ref'd

n.r.e.) (representation such as "solid construction" is a representation of existing material fact).

The word "meticulous" is defined as "taking or showing extreme care about minute details; precise; thorough." Random House Dictionary of the English Language (2d ed., unabr. 1987). Therefore, "meticulous construction" is reasonably interpreted to mean thorough, precise construction. Such a representation is indistinguishable from "solid construction" and indicates a high degree of quality such as "excellent" or "perfect." We conclude that the representation of "meticulous construction" made by Far West and GCAI was a representation of material fact.

Far West and GCAI also argue that there is no evidence or factually insufficient evidence of Hopper's reliance on the representations contained in the brochure in purchasing her condominium. Hopper testified that before buying the condominium she read the brochure and relied on the representations in it when she made her decision to buy the unit. This clearly is some evidence of reliance. In reviewing factual sufficiency points of error, we consider all the evidence to determine whether the findings are so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). After viewing all of the evidence, we conclude that the evidence is factually sufficient to support the jury's finding of reliance. Far West and GCAI's first point of error is overruled.

In their tenth point of error, Far West and GCAI complain that there is no evidence or factually insufficient evidence to support the jury's award of mental anguish. As stated above in connection with HOW's appeal, the record contains some evidence to support the jury's finding. In addition, after reviewing the entire record, we conclude that the evidence is factually sufficient to support the jury's award. Additionally, Far West complains that the jury award was excessive. In determining whether damages are excessive, this Court employs the same test as for any factual

insufficiency question. *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986). Since we have concluded that the evidence is factually sufficient, we likewise hold that the award was not excessive. Far West and GCAI's tenth point of error is overruled.

In their eighth point of error, Far West and GCAI complain of the trial court's rendition of judgment for Hopper for certain actual damages in the amount of $24,789.34. The amount of these damages was stipulated by all the parties, but the defendants did not stipulate to liability. Far West and GCAI claim that these damages are not proper because they are "rescission damages," and Hopper did not plead or pray for rescission. However, Far West and GCAI did not bring this alleged error to the attention of the trial court. Therefore, they waived any complaint they may have had concerning the trial court's rendition of judgment for such damages. Tex. R.App.P. 52(a) (Supp.1989); *see W.H. McCrory & Co. v. Contractors Equip. & Supply Co.,* 691 S.W.2d 717 (Tex.App.1985, writ ref'd n.r.e.); *Siegler v. Williams,* 658 S.W.2d 236 (Tex.App.1983, no writ). Point of error eight is overruled.

In their fifth and seventh points of error, Far West and GCAI argue that the trial court erred in awarding exemplary damages. First, they complain that the form of the jury question on exemplary damages was improper because it awards overlapping and duplicative damages. At trial, however, counsel for Far West and GCAI objected to this question only on the ground that there was no evidence to support its submission. Counsel for another defendant did make the specific objection that Far West and GCAI now seek to raise on appeal, but Far West and GCAI did not join in that objection. In trials where multiple defendants participate, "a party must make his own objection to the evidence, or an exception to the ruling of the court regarding the objection, if he wishes to preserve any error for appeal." *Wolfe v. East Texas Seed Co.,* 583 S.W.2d 481, 482 (Tex.Civ.App.1979, writ dism'd). This rule also applies to objections to the jury charge: a party must make his own specif-

ic objection to a jury question or expressly join in an objection made by another defendant, or the objection is waived. *Cf. Howard v. Phillips,* 728 S.W.2d 448, 451 (Tex. App.1987, no writ) (extending principle to offers of proof). We conclude that Far West and GCAI waived this objection to the jury question.

■ Their second complaint about the exemplary damages award is that there was no finding of intentional fraud to support the award under a common law fraud theory. Without reaching the complaint as to common law fraud, we hold that the award of exemplary damages was proper under Hopper's statutory fraud theory. A plaintiff is entitled to recover exemplary damages under statutory fraud if the false representation is made with actual awareness of the falsity of the representation. Tex.Bus. & Com.Code Ann. § 27.01(c). The jury found in answer to Question 5 that Far West made the representation with actual awareness of its falsity, and Far West and GCAI have not attacked this finding.

Even if Far West and GCAI had challenged the jury finding of actual awareness, the evidence is sufficient to sustain it. The record contains testimony by a construction supervisor that in at least two instances Far West, as the builder of the condominium complex, accepted bids that were disproportionately low, and that a disproportionately low bid is an indication that the subcontractor may not perform quality work. Furthermore, Far West's architect testified that the design specifications for the project (including the specifications for the stucco exteriors and the windows that were sources of the water intrusion) were changed by the builder because the design specifications became economically unfeasible; that he did not recommend the substituted exterior coating because of potential problems with improper installation; and that during construction he noticed "streaking" in the exterior coating and informed Far West that this "streaking" was probably caused by the improper installation of the coating. Finally, Hopper introduced into evidence a copy of a lawsuit filed by Far West against the stucco applicator before Hopper purchased her condominium, in which Far West alleged that the applicator failed to perform its work in a good and workmanlike manner, failed to perform the work according to the plans and specifications, failed to use qualified applicators, and failed to prepare a panel around the window openings for approval by the architect.

The above represents at least some evidence from which the jury could conclude that Far West and GCAI knew that the condominiums were not "meticulously" constructed when the representation was made to Hopper. Therefore, the exemplary damages award can be upheld under Hopper's statutory fraud cause of action without a finding of intentional fraud.

■ Finally, Far West and GCAI complain that the award of exemplary damages was improper because there was no evidence that they authorized or ratified any representation made to Hopper. As stated above, the jury specifically found that the principal, Far West, had actual awareness of the falsity of the representation. That finding, not attacked on appeal, obviates the need for a separate finding of authorization or ratification. Furthermore, the record contains the brochure and Hopper's testimony that it was given to her by a representative of Far West. This is sufficient to raise an inference that Far West and GCAI were aware of the representations contained in the brochure and yet took no affirmative action to correct it. This is some evidence that they impliedly ratified the representation. *See Thermo Products v. Chilton Ind. School Dist.,* 647 S.W.2d 726, 733 (Tex.App.1983, writ ref'd n.r.e.). We overrule points of error five and seven.

In their ninth point of error, Far West and GCAI attack the portion of the trial court's judgment awarding Hopper deposition expenses and expert witness fees, on the ground that these damages were not proper under DTPA or common law fraud. We overrule these points of error because such damages are expressly recoverable under a statutory fraud cause of action.

Tex.Bus. & Com.Code Ann. § 27.01(e). Their eleventh point of error, pertaining to the award of attorney's fees, is overruled for the same reason.

In their twelfth point of error, Far West and GCAI argue that Hopper is precluded from recovering any damages because her injuries resulted from damage to the common elements of her condominium, and that any liability as to the common elements was released in a settlement agreement between Far West and the homeowners' association board of directors. However, Far West and GCAI do not direct this Court to any of Hopper's damages that relate to the "common elements" to which the release pertained. Hopper's mental anguish damages and the corresponding exemplary damages clearly could not be released by the homeowners association. Point of error twelve is overruled.

Finally, Far West and GCAI complain in point of error four that the trial court erred in failing to require Hopper to elect her remedy. Assuming arguendo that Far West is correct and the trial court should have required Hopper to elect one of her three causes of action under which to recover, this Court is required to use the findings affording the greatest recovery and render judgment accordingly. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987). We find that all of the damage awards about which Far West and GCAI have preserved a complaint are recoverable under the statutory fraud claim. Point of error four is overruled.

The remainder of Far West and GCAI's points relate to Hopper's DTPA and common law fraud causes of action. Because Hopper's judgment can be supported on her statutory fraud cause of action, we need not address those points.

## IV. Hopper's Appeal

■ Hopper's sole complaint is that the trial court erred in rendering a judgment n.o.v. as to one of the jury's findings of damages. Question No. 14, in part, asked the jury to determine the difference, at the time the condominium was sold, "between the purchase price and the fair market value of unit 112 as it actually existed at that time." The jury found that difference to be $87,650.

A jury finding may be disregarded and a judgment n.o.v. rendered as to the issue only if there is no evidence to support the jury's finding. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 931 (Tex.1983).

Under section 27.01(b) of the Business & Commerce Code, a person who commits fraud in a real estate transaction is liable for "actual damages." This phrase has been interpreted to mean "such damages as result directly, naturally and proximately from fraud." *El Paso Dev. Co. v. Ravel*, 339 S.W.2d 360, 364 (Tex.Civ.App.1960, writ ref'd n.r.e.). The Texas Supreme Court enunciated the correct measure of damages in a defective construction case in *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1982). There are two generally recognized theories of recovery: the "difference in value" measure and the "remedial" or "cost of repair" measure. Texas courts generally allow damages based on cost of repairs if the repairs are feasible and do not involve economic waste. *Jim Walter Homes, Inc. v. Gonzalez*, 686 S.W.2d 715, 717 (Tex.App.1985, writ dism'd). Here, the jury found that repair would not be feasible, thereby limiting Hopper to the "difference in value" measure of damages.

To prove damages under a "difference in value" measure, a plaintiff must prove the purchase price of the property and the market value of the property at the time of sale. *Leyendecker & Associates, Inc. v. Wechter*, 683 S.W.2d 369 (Tex.1984); *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796 at 801 (Tex.App.1987, no writ). In the present case, it was undisputed that the price paid for the condominium was $97,-650. In addition, Hopper offered several witnesses to testify to the value of the property. However, all of the witnesses testified to the market value of the condominium at the time of *trial*. This does not constitute evidence of the market value at the time of *sale*. *Town East Ford*, 730 S.W.2d at 802.

Hopper argues that she, herself, testified to the value of the condominium when she

purchased it. The only portion of her testimony that arguably supports the proper measure of damages is the following:

Q. Knowing the problems that we have talked about that you've lived with the last four years, knowing that these problems do exist, do you have an opinion as to how much your unit was really worth back at the time you bought it, as opposed to what you thought it was worth?

A. That's a very difficult question to answer. Maybe $10,000 now, I don't know.

Hopper's testimony is no more than a scintilla of evidence of the market value of the condominium at the time of sale. First, the record contains nothing indicating that Hopper was familiar with the actual market value of her unit. Second, the extreme equivocation in her answer seems to confirm her lack of personal knowledge. Third, the use of the word "now" appears to indicate that Hopper's testimony, like that of the other witnesses, was based on her speculation as to the condominium's value at the time of trial rather than at the time of sale. Finally, it is unclear from her testimony whether the value she was referring to was market value, as opposed to intrinsic or some other value of the property. For these reasons, we conclude that the record contains no evidence of the actual market value of the property at the time of sale. *See Porras v. Craig,* 675 S.W.2d 503, 505 (Tex.1984). Hopper's point of error is overruled.

## V. Conclusion

The judgment against HOW was improperly granted because Hopper failed to plead and prove that the requisite DTPA notice was timely given or that she was excused from giving it; therefore, the judgment as to HOW is reversed and the cause is remanded to the trial court, with instructions to abate the suit for an appropriate length of time to allow Hopper to comply with the DTPA notice provisions. The judgment against Far West and GCAI, on the other hand, can be sustained on a cause of action other than the DTPA; therefore, the portion of the trial court's judgment awarding damages against Far West and GCAI is affirmed. Finally, the trial court did not err in disregarding the jury's finding of compensatory damages in answer to Question 14(1); therefore, the trial court's judgment n.o.v. as to these damages is affirmed.

Affirmed in Part and Reversed and Remanded in Part With Instructions.