**CENTRAL TEXAS HARDWARE, INC. and Switzer Deason, Appellants,**

v.

**FIRST CITY, TEXAS—BRYAN, N.A., formerly known as First City National Bank of Bryan, Texas, Appellee.**

No. A14–90–00181–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 25, 1991.

Rehearing Overruled May 30, 1991.

Fritz Barnett, James Greenwood, III, Houston, for appellant.

Fred Davis, William Steven Steele, Vaughan E. Waters, Bryan, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and CANNON, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

Central Texas Hardware, Inc. (CTHI) and its president, Switzer Deason, appeal from a take-nothing judgment in their suit against appellee, First City, Texas–Bryan, N.A. Appellants contend the bank failed to fund a loan of $100,000 which it allegedly promised CTHI for purchase of seasonal inventory goods. The trial court granted appellee a directed verdict on claims concerning the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA), TEX.BUS. & COM.CODE ANN. § 17.41 et seq. (Vernon 1987), anti-tying provisions of the federal Bank Holding Company Act Amendments of 1970, 12 U.S.C. § 1972 et seq. (1989), prima facie tort, and agency. The jury found in favor of the bank on the remaining charges of breach of contract, breach of duty of good faith and fair dealing and/or breach of fiduciary duty, fraud, and negligence. In a later proceeding, the trial court found the hardware store's DTPA claim was groundless and brought in bad faith, and it awarded appellee attorney's fees of $65,000. In five points of error, appellant contends the trial court erred in granting the directed verdicts, awarding attorney's fees, excluding certain evidence, and refusing to disqualify appellee's attorney. In a single cross point, the bank contends that, even if this Court finds reversible error, the D'Oench, Duhme doctrine precludes any damages against the bank for violation of an oral commitment. We affirm as modified.

Central Texas Hardware had been located in downtown Bryan for 57 years when Switzer Deason formed Central Texas Hardware, Inc. and purchased it in 1976. The purchase was financed largely by a $400,000 loan from appellee, guaranteed by the United States Small Business Administration (SBA). In 1982, the bank financed another loan, also guaranteed by the SBA, to move the store to a shopping center site. CTHI also began utilizing a line of credit which the bank provided on a short-term basis to accommodate CTHI's purchase of seasonal inventory goods.

Deason testified that in October 1985 he informed the bank's president, Mervin Peters, that CTHI anticipated the need to borrow $100,000 for seasonal inventory goods in January or February. Deason added that he received an oral commitment from Peters that the bank would comply with such a request. In December, according to Deason, Peters reassured him that the bank would loan CTHI the $100,000. At a meeting on January 28, 1986, Peters reportedly told Deason that the SBA was willing to combine the proposed $100,000 loan with the balance due on two previous debts. This would create a new, seven-year loan of approximately $550,000 with regular monthly payments. Deason testified that, although elated, he remained concerned that the restructuring might take too long for CTHI's immediate seasonal needs. However, he stated, because Peters assured him that it would only take "one to two weeks," Deason authorized the bank to negotiate the restructuring with the SBA. Week after week, the bank told Deason that the application was "in the mill," and they did not know why it was "being held up." But in May, Deason learned from the SBA that the bank was responsible for delaying the loan because it wanted the SBA to guarantee an additional five to 10 percent of the loan. By then, Deason testified, it was too late to seek alternate financing, and the hardware store closed its doors July 27, 1986.

■ In appellants' first point of error, they contend the trial court erred in granting a directed verdict on their DTPA claim. The bank had contended that CTHI is not a "consumer" within the meaning of the DTPA because CTHI did not seek or acquire goods or services by purchase or lease. See TEX.BUS. & COM.CODE Ann. § 17.45(4). The core of this argument is that money is neither a good nor a service; consequently, a pure loan transaction lies outside the DTPA. The supreme court has indeed so held in Riverside Nat'l Bank v. Lewis, 603 S.W.2d 169 (Tex.1980). CTHI responded that its claim falls within the ambit of other bank customer cases decided since Riverside in which borrowers have qualified as consumers if the money was

sought to acquire a good or service. For example, in *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382 (Tex.1982), the consumer plaintiff's objective was the purchase of a dump truck. In *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705 (Tex.1983), the bank agreed to provide interim financing for a house. The supreme court held that, viewed from the purchaser's perspective, plaintiffs "did not seek to borrow money; they sought to acquire a house." *Id.* at 708. In neither case, however, was *Riverside* expressly overruled. Further, in both *Knight* and *Flenniken*, the goods or services which the borrower sought formed the basis for the DTPA complaint. This is the second requirement in the supreme court's two-prong test for determining consumer status under the DTPA. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981) (citations omitted). "If either requirement is lacking, the person aggrieved by a deceptive act or practice must look to the common law or some other statutory provision for redress." *Id.* Here, appellants have not alleged any complaint regarding the inventory items which they would have purchased with the loan money. To the extent that appellants complain about the bank's negotiations with the SBA, these "services," for which no fee was charged, were merely ancillary to the processing of the loan application itself and thus not "services" under the DTPA. *Federal Deposit Ins. Corp. v. Munn*, 804 F.2d 860 (5th Cir.1986). Therefore, we overrule appellants' first point of error.

■ Next, we consider whether the trial court erred in awarding attorney's fees in favor of appellee. Section 17.50(c) of the DTPA provides as follows:

> On a finding by the court that an action under this section was groundless and brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorney's fees and court costs.

TEX.BUS. & COM.CODE ANN. § 17.50(c) (Vernon 1987). Appellants contend (1) as a matter of law, their DTPA claim was not groundless and brought in bad faith; (2) appellee waived the issue when it failed to request a jury issue on the reasonableness and necessity of attorney's fees; (3) appellants were denied a trial by jury on the issue; and (4) appellee failed to properly identify the fees and time spent defending the DTPA claim. Appellants submit that, even if this Court affirms the trial court's directed verdict on the DTPA claim, we should consider whether appellants' factual and legal arguments demonstrate a good faith belief that CTHI had a DTPA cause of action. We agree. To hold otherwise—that a directed verdict necessarily means the suit was groundless and brought in bad faith—could discourage a legitimately wronged consumer from seeking relief under the DTPA for fear of failing in court. *Donwerth v. Preston II Chrysler–Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex.1989).

"Groundless" under the DTPA means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law. *Id.;* Tex.R.Civ.P. 13. To prove "bad faith," appellee must have shown the claim was motivated by a malicious or discriminatory purpose. *Knebel v. Port Enterprises, Inc.*, 760 S.W.2d 829, 831 (Tex.App.—Corpus Christi 1988, writ denied). Appellants have cited a number of cases in which bank customers have prevailed in DTPA actions against lenders. They have cited a law review article that divines a trend toward courts accepting "the economic realities of the banking relationship" and "turn[ing] their emphasis in such cases away from the artificial standing issue and focus[ing] on the merits of the customer's complaint." Krahmer, Lovell, & McCormick, *Banks and the Deceptive Trade Practices Act*, 18 TEX.TECH.L.REV. 1, 44 (1987). Although we conclude the holding of *Riverside* is not limited to "a loan to cover another loan," as argued by appellants, we cannot say as a matter of law that appellants did not believe the bank violated their rights as a customer and consumer, or alternatively, that existing law as modified, extended, or reversed might remedy their loss. Nor do we find any evidence that appellants' DTPA claim was motivated by a malicious

or discriminatory purpose. Under the facts of this case, we hold that the trial court abused its discretion in ordering appellants to pay the bank's attorney's fees. Therefore, we sustain appellants' second point of error.

■ In their third point of error, appellants contend the trial court erred in excluding evidence that in 1985 and 1986 a significant amount of the bank's funds were shifted to its parent bank in Houston through sales of federal reserve system funds. According to appellants, this evidence that the bank was "being tugged on by a starving parent or Lead Bank in Houston that sucked them dry of the liquidity they had to have if they were to serve [CTHI] and other local customers" is relevant because it tends to show the bank's motive for not honoring its loan commitment to CTHI. However, the fact that the bank did not fund the loan is not in dispute. Further, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." TEX.R.CIV.EVID. 403. We hold that the trial court did not abuse its discretion in determining that the prejudicial effect of arguing that the bank was sacrificing the interests of Brazos County citizens outweighed the probative value of this marginally relevant evidence. We overrule point of error number three.

■ Next, appellants contend the trial court erred in granting a directed verdict on their claim that CTHI was required to maintain an exclusive banking arrangement with First City, thereby preventing CTHI from soliciting a loan from another source. An anti-tying cause of action requires proof of three elements. *Rae v. Union Bank*, 725 F.2d 478, 480 (9th Cir. 1984); *Federal Deposit Ins. Corp. v. Eagle Properties, Inc.*, 664 F.Supp. 1027, 1054 (W.D.Tex.1985). First, the practice in question must benefit the bank. *Id.* Here, the bank benefited by charging CTHI inter-

est and fees in excess of $616,000 from 1976 through 1986. Secondly, the practice must be unusual in the banking industry. *Id.* Appellant's sole evidence in this regard is rather nonspecific testimony by the bank's chairman, Bookman Peters, who stated that it would not be usual for a bank to require a customer to deal exclusively with it. However, he added that neither would it be enforceable because frequently a bank is not aware of whether a customer banks elsewhere. Thirdly, the practice must involve an anti-competitive tying arrangement. *Id.* Deason merely testified that it was his "understanding" that for the bank to provide for CTHI's financial requirements, he could not borrow from other banking institutions. He presented no facts to evidence a mandatory, exclusive relationship that departed from customary banking principles. "[I]t is normal and traditional practice for a prospective borrower to keep with the lending bank its business deposits and for the bank to protect its investment by imposing restrictions on borrowing by debtor from other concerns[.]" *Nesglo, Inc. v. Chase Manhattan Bank, N.A.*, 506 F.Supp. 254, 264 (D.Puerto Rico 1980). We overrule point of error number four.

■ In appellants' fifth point of error, they contend the trial court erred in refusing to disqualify the bank's attorney. Alleging a conflict of interest that threatened the confidences of CTHI's previous attorney-client relationship with the bank's law firm [1], CTHI filed a pretrial motion to disqualify the firm. The trial court held a hearing and overruled the motion. The First Court of Appeals denied appellants' motion for leave to file a petition for writ of mandamus, concluding that appellants failed to meet the supreme court's "substantial relationship" test for disqualification:

> After reviewing the record we conclude that the relator [CTHI] has not clearly demonstrated the existence of a

---

1. Canon 4 of the Texas Code of Professional Responsibility imposes the duty to preserve the confidences and secrets of both current and former clients. Canon 9 mandates that lawyers, through the exercise of personal, professional, and ethical judgment, avoid any activity that might give rise to an appearance of impropriety.

prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to former counsel will be devulged [sic] to their present adversary. We hold that the record shows that the respondent trial court judge did not abuse her discretion in finding that the matters in the pending suit are not substantially related to the previous representation. *NCNB Texas Nat'l Bank v. Coker,* 765 S.W.2d 398 (Tex.1989).

In the hearing on appellants' motion to disqualify the bank's attorneys, counsel for appellants suggested that instead of weighing the evidence under the "substantial relationship" test, the trial court should have examined it "with a view of whose ox is being gored." We wil follow the *Coker* test with an eye toward whose ox is being gored.

The bank's lawyers, Davis & Davis and its predecessor firms, created CTHI in 1976 to acquire Central Texas Hardware from its former owners. Three of the firm's attorneys incorporated CTHI, drafting its bylaws and articles of incorporation, and advising Deason on the observance of corporate formalities. A partner, A.W. Davis, was CTHI's agent for service until April 20, 1989—more than a month after the Davis firm, as counsel for the bank, served appellants with a cross-action alleging that CTHI is but the alter ego of Deason. Challenging the validity of a corporation which the bank's lawyers helped create, the counterclaim alleged that Deason ignored the separate existence of the corporate entity and used it as a device to cause harm or prejudice those dealing with it. Appellants contend that this "obvious overlap of loyalties ... cried out for honorable withdrawal," and we would be apt to agree had the bank not moved for a nonsuit as to the allegations against Deason at commencement of the trial. A.W. Davis also resigned as CTHI's agent of service.

In addition to helping incorporate CTHI, between 1976 and 1983 the bank's law firm represented CTHI on such matters as negotiating the renewal and extension of a note and deed of trust, drafting a buy-sell stock agreement between Deason and a CTHI employee, and reviewing documents relating to the acquisition of oil and gas leases. Additionally, a former partner signed SBA loans as CTHI's assistant corporate secretary, and assisted in the closing of an SBA loan in 1982. It is the restructuring of this loan that appellants contend the bank wrongfully delayed, thus causing the hardware store to close. Finally, appellants contend that Deason met with yet another partner, Fred Davis, regarding potential litigation against an auctioneer who conducted a sale of inventory that remained after the hardware store closed. Although the firm declined to represent CTHI in the matter, Deason testified that his discussion with Fred Davis involved "the full range of subjects relative to the losses that the corporation sustained."

The bank's law firm denies that it was ever retained as CTHI's "corporate counsel," but merely represented CTHI on an "as needed" basis. A.W. Davis testified that Deason revealed no secrets or confidences to him that would be useful in representing the bank in this case. Fred Davis stated that Deason's potential claim against the auctioneer bore no relationship to issues in this case.

Absent the claim that Deason failed to observe corporate formalities, appellants have failed to meet their burden of demonstrating a substantial relationship between their previous employment of the bank's law firm and the loan commitment in question, which Deason admits he and the bank's president negotiated individually and without counsel on either side. Neither have appellants shown "a reasonable possibility that some specifically identifiable impropriety occurred and the likelihood of public suspicion." *Hydril Co. v. Multiflex, Inc.,* 553 F.Supp. 552, 557 (S.D.Tex. 1982) (quoting *Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir.1976)). We hold that the trial court did not abuse her discretion in refusing to disqualify the bank's attorneys, and we overrule point of error number five.

**240**

Finally, we consider appellee's cross point that the holding of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), precludes any damages against the bank. The *D'Oench* doctrine shields a subsidiary of a parent institution whose assets have been acquired by the Federal Deposit Insurance Corporation. *See Federal Savings and Loan Ins. Corp. v. T.F. Stone–Liberty Land Assoc.*, 787 S.W.2d 475, 488–89 (Tex. App.—Dallas 1990, writ granted). However, we find no proof in the record of FDIC involvement, nor have any damages been awarded against the bank. Therefore, we dismiss appellee's cross point as moot.

The judgment of the trial court is affirmed as modified.