**NORWEST MORTGAGE, INC., Appellant,**

v.

**Jose B. SALINAS and Victoria B. Salinas, Appellees.**

No. 13–96–552–CV.

Court of Appeals of Texas, Corpus Christi.

July 1, 1999.

Harvey Ferguson, Jr., Chaves, Gonzales & Rodriguez, Paul W. Nye, Audrey Mullert Vicknair, Roberta Dohse, Chaves, Gonzalez & Hoblit, Corpus Christi, for Appellant.

Larry G. Hyden, Henkel, Hyden & Sanders, John Blaise Gsanger, William R. Edwards III, Edwards, Perry & Haas, J. Mitchell Clark, Corpus Christi, for Appellee.

Before Chief Justice SEERDEN and Justices YAÑEZ and CHAVEZ.

## OPINION

Opinion by Justice YAÑEZ.

Mr. and Mrs. Jose B. Salinas ("the Salinases") instituted this suit against Norwest Mortgage, Inc. ("Norwest") for recovery of damages in connection with a loan agreement financing the construction and purchase of a home. The jury found Norwest liable for breach of contract, fraud, negligent misrepresentation, gross negligence, and knowing violations of the Deceptive Trade Practices Act ("DTPA").[1] The Salinases elected to recover under the DTPA and the trial court awarded damages based solely on the DTPA claims. Norwest raises seventeen points of error, contending: (1) the evidence is legally and factually insufficient to support the jury's findings of fraud, negligent misrepresentation, gross negligence, violations of the DTPA, and the mental anguish damages awarded under the DTPA; (2) the trial court erred in instructing the jury, admitting improper witness testimony, and in awarding damages for mortgage payments made by the Salinases and attorneys' fees as a percentage of DTPA damages; (3) that the jury's answers are inconsistent; and (4) the judgment improperly includes the jury's findings on issues other than violations of the DTPA. In two conditional cross-points, to be considered only if we reverse any aspect of the trial court's judgment based on the DTPA, the Salinases contend (1) the trial court erred in failing to include prejudgment interest from the calculation of additional damages under the DTPA and (2) the evidence is sufficient to support the jury's findings of negligent misrepresentation and gross negligence. We affirm the judgment of the trial court.

1. TEX. BUS. & COM.CODE ANN. § 17.41 *et seq.* (Vernon 1987 and Supp.1999). Unless otherwise noted, all references to the DTPA in this

opinion pertain to the Act as it was written before the effective date of the 1993 and 1995 amendments.

## I. Facts

In August of 1991, the Salinases contacted several builders, including Bay Area Builders ("Bay Area"), for the purpose of soliciting a bid for the construction of a new home. The Salinases became interested in Bay Area when they visited a "Parade of Homes," which featured homes advertised as built by Bay Area and financed by Norwest. The Salinases met with Bay Area's Bertha Ortiz, who told them that Norwest would consider financing their home construction loan if they put up $200 in earnest money and agreed to purchase a home from Bay Area. The Salinases signed an "Agreement to Sell" with Bay Area on or about September 10, 1991. The agreement provided for a sales price of $124,900 and a loan in the amount of $138,100.[2] Shortly thereafter, Ortiz arranged a meeting, held at Bay Area's offices, between the Salinases and Randy Smith, a Norwest loan officer. At the meeting, Smith described the benefits of Norwest's "Single Closing Construction Loan Agreement," which provides, among other things, for interim and permanent financing and supervision by Norwest over a phased disbursement of funds to approved builders. The Norwest single closing agreement, signed by the Salinases and Bay Area on or about October 31, 1991, provides for a note in the amount of $138,100, construction to be completed by February 25, 1992, and for the commencement of mortgage payments on March 1, 1992, whether or not construction is complete. It further provides authorization for Norwest to "inspect and check the construction of the improvements," advance funds "in proportion to its inspector's report of progress of construction," and that Bay Area was required to provide Norwest with lien waivers from all parties furnishing labor and materials to the job prior to each advance of funds. The agreement also provides for the Salinases to execute a "Security Instrument" in favor of Norwest and for "assignment" to Norwest of any indebtedness owing to Bay Area by the Salinases under the separately executed "Builder's and Mechanic's Lien Contract."

Bay Area did not complete construction of the home by the February 25 completion date. Nonetheless, the Salinases were required to begin making regular mortgage payments starting March 1, 1992.

In late March 1992, Smith contacted several Norwest clients, including the Salinases, whose homes were then under construction by Bay Area. Norwest held a meeting to inform the clients of recently acquired information regarding problems with Bay Area. Smith and several Norwest management officials, including an attorney and the regional manager, attended the meeting. The Salinases were told that Bay Area had ceased working on the house and that Norwest had refused to provide additional funds because of reports that Bay Area had not paid outstanding bills related to the construction. Norwest advised the Salinases that liens totaling approximately $47,000 had been filed on the property and that if they so desired, they could select another builder. Further attempts to resolve the problems with Bay Area were unsuccessful. In May 1992, the Salinases sought legal representation. In October 1992, Norwest accepted a $57,700 proposal from North Padre Properties ("North Padre") to complete construction on the Salinas home within approximately sixty days. The Salinases knew Norwest had solicited bids from several builders, but were not involved in the selection of North Padre to complete the work. Mr. Salinas testified he had some reservations

**2.** The loan amount exceeds the contract sales price, in part, because it includes funds to pay off the remaining balance on the lot, which had been purchased separately by the Salinases.

about the decision because he did not believe North Padre was a member of the local builder's association. North Padre began work at the site in November 1992.

In February or March of 1993, the Salinases met with Pat Childers of North Padre to discuss the progress of the work and various related matters. Childers testified that he expected payment from the Salinases for some "extra" work performed at their request.[3] Mr. Salinas did not pay North Padre because the work on the house was incomplete and he feared North Padre would stop work altogether if payment was made. Shortly thereafter, North Padre ceased working on the house. Childers testified that North Padre was paid approximately $57,000 by Norwest for work performed on the house.[4]

Even though the house was incomplete, the Salinases obtained a certificate of occupancy and began living in the house in March of 1993, after having made regular mortgage payments for a year. Shortly thereafter, the Salinases solicited a $13,700 proposal from another builder to repair and/or complete work on the house. At the time of trial, Mr. Salinas testified that liens totaling approximately $11,000 were on file related to construction on the home.

On February 12, 1993, the Salinases filed suit against Norwest and Bay Area, alleging various theories of recovery. After trial began, the Salinases accepted an offer of settlement from Bay Area. The jury found Norwest liable for breach of contract, fraud, negligent misrepresentation, gross negligence, and for knowingly violating the DTPA by both deceptive and unconscionable acts. The jury awarded

damages on all causes of action, and the Salinases elected to recover under the DTPA. The trial court entered judgment, awarding the Salinases $659,917.23 in damages, including an additional award of two times the DTPA recovery and attorney's fees of forty percent (40%) of the total DTPA award.

## II. Standard of Review

In reviewing a legal sufficiency challenge, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting,* 964 S.W.2d 276, 286 (Tex.1998). We sustain a legal sufficiency challenge when the record discloses: (1) that there is a complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *City of Alamo v. Casas,* 960 S.W.2d 240, 249 (Tex.App.—Corpus Christi 1997, pet. dism'd by agr.). "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Associated Indem. Corp.,* 964 S.W.2d at 286; *Merrell Dow,* 953 S.W.2d at 711 (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994)). When confronting a factual insufficiency challenge, we overturn findings only

---

**3.** The Salinases do not dispute that they agreed to pay North Padre an agreed-upon sum for the items and that they have not done so. Some of the items, however, characterized by North Padre as "extra," such as plumbing for a jacuzzi bathtub, were not considered "extra" by the Salinases because those items were not considered "extras" under the contract with Bay Area.

**4.** Childers also testified that he "probably" removed the whirlpool motor, range, exhaust fan, and light fixtures from the house because he may have "felt we were going to get burned."

if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996).

## III. DTPA Claims

We will begin with the appellant's challenges to the findings in appellees' favor on their various theories of liability. In points of error nine through twelve, Norwest challenges the jury's findings of liability for violations of the DTPA. Norwest contends: (1) the Salinases are not "consumers" within the meaning of the DTPA because the injuries they suffered did not occur in connection with the lending of money; (2) the evidence is legally and factually insufficient to support the jury's findings that Norwest knowingly engaged in deceptive acts; (3) the evidence is legally and factually insufficient to support the jury's findings that Norwest engaged in unconscionable acts; and (4) the evidence is legally and factually insufficient to support the jury's finding that Norwest's violations of the DTPA were the producing cause of the Salinases' damages.

To recover under the DTPA, a plaintiff must establish "consumer" status, that the defendant engaged in either false, misleading, or deceptive acts or practices or an unconscionable act, and that the act or acts constituted a producing cause of the plaintiff's damage. TEX. BUS. & COM.CODE ANN. § 17.50(a)(1)(3) (Vernon 1987); *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 649 (Tex.1996); *Smith v. Herco, Inc.,* 900 S.W.2d 852, 858 (Tex.App.—Corpus Christi 1995, writ denied).

### A. Consumer Status

■ Whether or not a plaintiff is a "consumer" under the DTPA is a question of law to be determined by the trial court from the evidence, and the trial court will not submit issues to the jury as to violations of the DTPA if it has determined that the plaintiff is not a consumer. *Holland Mortg. and Inv. Corp. v. Bone,* 751 S.W.2d 515, 517 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e). When the trial court submits a jury issue on DTPA violations, the court has implicitly determined that the complainant is a consumer under the Act. *HOW Ins. Co. v. Patriot Fin. Serv. of Texas, Inc.,* 786 S.W.2d 533, 538 (Tex.App.—Austin 1990, writ denied). In the present case, the trial court determined the Salinases were consumers under the Act because it submitted DTPA issues to the jury.

■ To have standing to sue under the DTPA, a party must establish that he is a consumer, as defined by the DTPA. *Brown v. Bank of Galveston, Nat. Ass'n,* 930 S.W.2d 140, 143 (Tex.App.—Houston [14th Dist.] 1996), *aff'd,* 963 S.W.2d 511 (Tex.1998) (citations omitted). A party is a consumer under the DTPA if he meets two requirements. *Id.* (citations omitted). First, the party must seek or acquire goods or services by purchase or by lease. TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987). Second, the goods or services sought or acquired must form the basis of the party's complaint. *Brown,* 930 S.W.2d at 143. In determining whether a plaintiff is a consumer, the focus is on the plaintiff's relationship to the transaction. *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 815 (Tex.1997).

■ Norwest argues that the injuries suffered by the Salinases were not sustained "in connection with" the lending of money. We disagree. The essence of the Salinases' complaint is that Norwest failed to properly supervise funding during construction of their home and failed to abide by its mandatory policy of obtaining lien waivers prior to the disbursement of funds. The injuries suffered by the Salinases were sustained "in connection with" the "services" they acquired from Norwest.

In support of their argument that any injuries suffered by the Salinases were not

sustained "in connection with" the lending of money, Norwest directs our attention to *Central Tex. Hardware, Inc. v. First City, Texas–Bryan, N.A.*, 810 S.W.2d 234 (Tex. App.—Houston [14th Dist.] 1991, writ denied) and *Bank of El Paso v. T.O. Stanley Boot Co.*, 809 S.W.2d 279 (Tex.App.—El Paso 1991) *aff'd in part, rev'd in part on other grounds* 847 S.W.2d 218 (Tex.1992). We find these cases distinguishable from the present action.

In *Central Texas*, a business which sought to borrow money from a bank for the purchase of seasonal inventory goods was not a consumer as to the bank because the goods or services sought (the inventory goods) did not form the basis of the complaint. *Central Texas*, 810 S.W.2d at 237. The court noted that the supreme court has held borrowers to be consumers when the borrower's *objective* in seeking a loan is the purchase or lease of a good or service and the goods or services sought form the basis of the complaint. *Id.* (citing *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382 (Tex.1982); *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705 (Tex.1983)). Similarly, *Stanley Boot Co.* simply stands for the proposition that a pure loan transaction lies outside the DTPA. *See Stanley Boot Co.*, 809 S.W.2d at 288.

■ A person who seeks only to borrow money is not a consumer under the DTPA because money is not a good or a service. *Brown*, 930 S.W.2d at 143 (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174–75 (Tex.1980)). However, where the extension of credit is incident to the sale of goods or services and the conduct of the party extending the credit is intertwined in the transaction, the borrower may be a consumer with respect to the creditor, as well as to the seller, of the goods. *Id.* (citations omitted). A creditor may be inextricably intertwined in the transaction so as to confer consumer status on a party if the extension of credit forms the means of making the sale or purchase from the buyer's perspective. *Id.* at 143–44. The DTPA does not impose vicarious liability based on innocent involvement with business transactions. *Brown*, 963 S.W.2d at 514 n. 1. To hold a creditor liable in a consumer credit transaction, the creditor must be shown to have some connection either with the actual sales transaction *or with a deceptive act related to financing the transaction.* *Brown*, 930 S.W.2d at 144 (emphasis supplied).

In the present case, the Salinases purchased a home to be built by Bay Area and financed by Norwest. The evidence shows that Norwest's conduct is inextricably intertwined in the transaction and that a "tie-in" relationship existed between Bay Area and Norwest. Bay Area's promotional sales signs advertised "financing available by Norwest." Bay Area's sales representatives made the initial contact and arranged a meeting, held at Bay Area's offices, between Norwest's Randy Smith and the Salinases. The Salinases, Bay Area, and Norwest were parties to the single closing construction loan agreement, which provided for inspections and, upon receipt of lien waivers, disbursement of funds by Norwest. In Holland, a borrower established consumer status in an action against a mortgagor by showing some evidence of a "tie-in" relationship between the builder and the lender where the builder recommended the services of the mortgage company and arranged an appointment for the borrower. *Holland*, 751 S.W.2d at 518.

Moreover, the evidence shows that Norwest's own acts violated the DTPA. Norwest acted unconscionably by failing to properly monitor the construction schedule and supervise the disbursement of loan funds. We hold that the trial court did not err in determining that the Salinases were consumers within the meaning of the

DTPA. We overrule Norwest's twelfth point of error.

## B. Unconscionable Acts

 In its ninth and eleventh points of error, Norwest complains the trial court erred in entering judgment for violations of the DTPA because the evidence is legally and factually insufficient to support the jury's findings that Norwest acted unconscionably and knowingly engaged in false, misleading, or deceptive acts. In its tenth point of error, Norwest asserts that the evidence is legally and factually insufficient to show that its actions were a producing cause of damages to the Salinases.

The trial court's DTPA judgment can be supported by sufficient evidence of *either* deceptive acts *or* unconscionability. Since we conclude that the evidence adequately supports the jury's finding of unconscionability, we will address only that issue.

Under the applicable version of the DTPA, unconscionability was defined as follows:

> "Unconscionable action or course of action" means an act or practice which, to a person's detriment:
>
> (A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or
>
> (B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

TEX. BUS. & COM.CODE ANN. § 17.45(5) (Vernon 1987).[5]

In the present case, the issue of whether Norwest engaged in unconscionable acts was presented to the jury by the following question:

Did Norwest Mortgage, Inc. engage in any unconscionable action or course of action that were *[sic]* a producing cause of damages to Jose B. Salinas and Victoria B. Salinas?

## INSTRUCTIONS

"Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a person's detriment -

a. takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree, OR

b. results in a gross disparity between value received and consideration paid in a transaction involving transfer of consideration.

Answer "Yes" or "No."

The jury answered "yes" to this question. Norwest concedes that "[t]he jury was properly instructed" and does not challenge the wording of the question on appeal. Accordingly, the sufficiency of the evidence must be examined in view of the question and instruction as submitted to the jury. *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.,* 928 S.W.2d 100, 107 (Tex.App.—Houston [14th Dist.] 1996, n.w.h.) (citing *Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985)).

Parts "a" and "b" of the instruction were submitted disjunctively, such that an affirmative finding by the jury on either "a" *or* "b" was sufficient to support the jury's finding that Norwest engaged in unconscionable conduct. On appeal, Norwest

---

**5.** In 1995, the Legislature rewrote § 17.45(5) to eliminate subparagraph (B). Acts 1995, 74th Leg., ch. 414, § 2, effective September 1, 1995. A lawsuit filed on February 12, 1993 is governed by the law applicable to the claim prior to the effective date of the amendments.

only challenged the sufficiency of the evidence as it applied to part "a" of the instruction.[6] No challenge was raised as to the sufficiency of the evidence as it applies to part "b." Because we find the evidence sufficient to support the jury's finding on the basis of part "b," we do not address the evidence as it applies to part "a."

Under part "b," the Salinases contend the record contains sufficient evidence that a gross disparity existed between the value they received from Norwest under the one-time loan closing program and the consideration they paid. We agree.

The record shows that Norwest failed to properly supervise construction, monitor the construction schedule, control disbursement of the loan funds, and obtain lien waivers prior to the disbursement of funds, all of which resulted in the gross disparity between the value received by the Salinases and the consideration paid. Norwest agreed to inspect the progress of the construction and supervise disbursement of the loan funds upon receipt of lien waivers and in accordance with the "construction loan advance schedule." The single-closing agreement, which delineates the rights and obligations of the parties, provides, in pertinent part:

> 12. It is understood and agreed that NMI[7] will advance the Construction Funds and Trust Funds only when there is no default hereunder and only in proportion to its inspector's report of progress of construction, retaining at all times sufficient funds which, in the opinion of its inspector, will complete the improvements. NMI may disburse Trust Funds and Construction Funds to Builder or directly to sub-contractors, materialmen and laborers, at NMI's option.
>
> 13. NMI retains the right to withhold any disbursement of the Construction Funds or the Trust Funds if, in its sole judgment, any unsatisfactory deviation from the plans and specifications occurs, any defective work or material is not remedied, Builder fails to make payments to sub-contractors, if the work is not performed in a workmanlike manner, if changes are made in the construction plans and specifications without NMI's written consent, if any lien, other than a lien in favor of NMI, is filed against the Property, or if Borrower or builder defaults under this Agreement or any other agreement executed in connection herewith.
>
> . . . .
>
> 16. On completion of the construction and each and every stage thereof for which payment is requested and *prior to each advance of funds, Builder shall furnish to NMI completed waivers of liens*, each executed by the appropriate provider of labor and/or material, together with a certificate that lien waivers have been executed by all parties furnishing labor and materials in connection with the construction of the improvements to the date thereof.

(Emphasis supplied).

In addition, the construction loan advance schedule provides, in pertinent part, that "prior to the disbursement of any funds, lien waivers covering previous ad-

---

6. We note that appellants cite *Home Sav. Ass'n Serv. Corp. v. Martinez*, 788 S.W.2d 52 (Tex.App.—San Antonio 1990, writ denied) in support of their claim that the evidence is insufficient to support a finding that Norwest violated part (a). We find *Martinez* distinguishable. In *Martinez*, the court noted in *dicta* that no gross disparity in violation of the DTPA existed between the value homeowners received from a lender and the consideration paid, where the lender, in financing a home improvement loan, provided homeowners with checks for $20,000, which homeowners endorsed to a builder, in consideration for a note in the principal amount of $20,400.

7. Norwest Mortgage, Inc.

vances must have been received by NMI." Moreover, Norwest's "Single Close Construction Loan Manual" provides, in pertinent part:

> Lien waivers from all subcontractors and suppliers are required and must be submitted to the LPO Construction Department. Lien waivers from the subcontractors and suppliers who were to be paid from the prior advance must be presented before funds can be disbursed for the current advance request.
>
> . . . .
>
> Each lien waiver must be checked against the inspection report and sworn construction statement for consistency.
>
> . . . .
>
> Inspection reports must be reviewed carefully, especially in states where lien waivers are not required, to ensure that the builder is receiving draws only for work actually completed.
>
> . . . .
>
> [A]n inspection must be completed prior to disbursing funds for each draw request. The inspector must verify that all of the work specified in the draw request has been completed.
>
> . . . .
>
> [L]ien waivers are mandatory on each line item for each draw, regardless of the advance schedule used. The names and amounts, etc., on each lien waiver must be checked against the cost breakdown and inspection report for consistency as well as the previous draws.

Because Norwest was obligated to obtain lien waivers prior to disbursing funds, the lien waivers obtained during construction should total approximately the amount actually disbursed.[8] Norwest made the following advances to Bay Area:

| Date | Draw Amount |
|---|---|
| 11–8–91 | $ 20,216.39 |
| 11–14–91 | $ 5,429.61 |
| 12–4–91 | $ 25,246.00 |
| 1–8–92 | $ 30,520.00 |
| 2–3–92 | $ 12,999.00 |
| 2–21–92 | $ 10,191.44 |
| 3–30–92 | $ 2,400.00 |
| 4–17–92 | $ 4,188.85 |
| Total | $111,191.29 |

Assuming no lien waivers were required prior to the initial disbursement of $20,216.39, Norwest should have obtained lien waivers totaling approximately $90,974.90 for work through April 1992. However, Norwest can only show lien waivers totaling $43,779.11 for work completed during this period.[9]

As for the gross disparity between the consideration paid and the value received, the Salinases paid $300 to Norwest to perform the required inspections. The Salinases' note in favor of Norwest, in the principal amount of $138,100, calls for regular monthly payments for thirty years. As of the time of trial, the Salinases had made all regular payments as required under the note. Mr. Salinas testified that at the time of trial, there were liens against the home totaling approximately $11,000. The Salinases presented expert testimony that as of June 1, 1995, the estimated cost to repair and complete the home according to the plans and specifications, as it should have been completed in May 1992, was approximately $52,790.[10]

We find the evidence is sufficient to support the jury's finding that the Salinas-

8. According to testimony presented at trial and Norwest's manual, lien waivers are not required prior to the first advance because the first draw typically includes funds to pay off any balance remaining on the borrower's lot. In the present case, the first advance was for $20,216.39 and the Salinases' lot payoff amount was $13,459.20.

9. Mr. Salinas testified that at the May 1992 meeting with Norwest, he was informed that liens totaling approximately $47,000 were then on file on the property.

10. This "cost of repairs" estimate included 7% for "contingencies," but did not include any amount for overhead or profit.

es suffered from a gross disparity between the value they received from Norwest and the consideration they paid in violation of the DTPA. We overrule appellant's ninth point of error.

### C. Producing Cause

■ Norwest contends that all of the Salinases' damages are attributable to the failure of the builders, Bay Area and North Padre, to timely complete the construction of their home in a satisfactory manner and that the Salinases cannot show that any act or omission by Norwest was the producing cause of their injuries. Norwest argues that it "had no right to directly control the builders or the work site" and that the Salinases were responsible for selecting Bay Area prior to any dealings with Norwest. Norwest also contends that it cannot be held responsible for Bay Area's insolvency or the dispute between the Salinases and North Padre, which resulted in North Padre walking off the project.

■ Producing cause requires that the acts be both a cause-in-fact and a "substantial factor" in causing the injuries. *Brown,* 963 S.W.2d at 514 (citing *Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995); *Prudential Ins. Co. v. Jefferson Assocs. Ltd.,* 896 S.W.2d 156, 161 (Tex.1995)). A producing cause is an efficient, exciting, or contributing cause, which in the natural sequence of events, produces injuries or damages. *Id.* (citing *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995)); *Townsend v. Catalina Ambulance Co.,* 857 S.W.2d 791, 795 (Tex.App.—Corpus Christi 1993, no writ). The first component of producing-cause analysis is a purely fact-based examination, considering whether, but for the defendant's conduct, the plaintiff's injuries would not have occurred. *Amstadt,* 919 S.W.2d at 655 (Gonzalez, J., concurring in part and dissenting in part) (describing producing-cause analysis) (citations omitted). Under the DTPA, a defendant's acts cannot be the producing cause of a plaintiff's injuries unless the injuries flowed from the defendant's misconduct in connection with a consumer transaction. *Id.*

■ The second inquiry in producing-cause analysis is whether the defendant's conduct was the "legal cause" of the plaintiff's injuries; that is, whether it was such a substantial factor in causing the plaintiff's injuries that liability should be imposed. *Id.* (citations omitted). Policy-based considerations and "common-sense notions of responsibility" should guide the determination of whether the causal connection between the defendant's acts and the plaintiff's injuries merits the imposition of DTPA liability. *Id.* (citing WILLIAM POWERS, JR., TEXAS PRODUCTS LIABILITY LAW § 6.022, at 6–4, 6–20 (2d ed.1992)).

The jury found the Salinases' damages were: (1) the cost to repair and complete the house; (2) the cost to rent alternative housing while the repairs were in progress; (3) the mental anguish suffered by the Salinases; and (4) the mortgage payments made by the Salinases prior to substantial completion of the home.

In this instance, the Salinases' damages flow from Norwest's unconscionable conduct in failing to obtain lien waivers prior to disbursing funds and failing to properly supervise the disbursement of funds. The evidence shows that Norwest's failure to obtain lien waivers and properly supervise disbursement resulted in improper advances to Bay Area for work which was, in some cases, incomplete, unsatisfactory, and subject to liens because of failure to ensure payment to subcontractors. These acts and omissions can logically be considered an efficient, exciting, or contributing cause of the damages found by the jury. We hold the evidence is sufficient to show that Norwest's acts and omissions were both a cause-in-fact and a "substantial fac-

tor" in causing the Salinases' damages. We overrule appellant's tenth point of error.

### D. "Knowingly" Engaged in Conduct

After finding, in response to separate questions, that Norwest engaged in false, misleading, or deceptive acts and engaged in unconscionable conduct, the jury answered "yes" to the following question:

> Did Norwest Mortgage, Inc. engage in any such conduct knowingly?

### INSTRUCTIONS

"Knowingly" means actual awareness of the falsity, deception, or unfairness of the conduct in question. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

In answering this question, consider only the conduct that you have found was a producing cause of damages to Jose B. Salinas and Victoria B. Salinas.

Norwest only challenged the jury's finding that it knowingly engaged in conduct in violation of the DTPA with respect to the finding that it engaged in a false,

misleading, or deceptive act. No challenge was raised to the jury's finding of knowing violations with respect to the finding of unconscionable conduct. The jury could have based its finding of a "knowing" violation on a determination that Norwest knowingly engaged in unconscionable conduct. Because we have found the evidence sufficient to support the jury's finding of unconscionable conduct, we do not address Norwest's eleventh point of error challenging the sufficiency of the evidence with respect to whether it knowingly engaged in a false, misleading, or deceptive act.

### IV. Evidentiary Error

■ In its fourth point of error, Norwest contends the trial court erred in allowing the testimony of Floyd Brown, one of the Salinases' witnesses, regarding the legal consequences of Norwest's assumption of Bay Area's indebtedness. Brown testified that in his opinion, the legal effect of paragraph 26[11] of the single-closing agreement, which provides for assignment of any indebtedness owing to Bay Area under the Builder's and Mechanic's Lien Contract, is that Norwest assumed all of Bay Area's rights and duties.[12] The Salinases claim that Norwest waived any ob-

---

11. Paragraph 26 of the agreement provides as follows:

> *Assignment of Contract.* NMI has no obligation to make the loan until Builder sells the indebtedness owing under the Builder's and Mechanic's Lien Contract of even date herewith together with the mechanic's lien security interest securing the payment thereof and financing statement, if any, (the "Builder's Documents") to NMI by Assignment and endorsement, in form and substance satisfactory to NMI. The purchase price (the "Purchase Price") of the Builder's Documents shall be the contract price (the "Contract Price") set forth in the contract or so much thereof as may be earned thereunder. The Purchase Price shall be payable in installments, in amounts and at times as Borrower and Builder request NMI, as provided in Section 10 hereof, to advance Construction Funds to pay Builder for work which has been performed under

the Contract, but in no event shall the total Purchase Price exceed the original contract Price unless otherwise agreed to in writing among Borrower, Builder, and NMI. If the original Contract Price exceeds the Purchase Price, then Builder does hereby subordinate the excess of the Contract Price over the Purchase Price to the lien of NMI."

12. Specifically, Brown testified, in pertinent part, as follows:

> Q: Is it a fair statement to say that Norwest winds up with the rights of the builder under this contract here?
> A: They do.
> . . . .
> Q: [by plaintiffs' counsel] Is there anything that Norwest wasn't in control of on this project?
> A: No. When those documents were assigned to Norwest, Norwest took the position of the builder. Now, if they elected to allow that builder to go ahead and con-

jection to Brown's testimony because it did not timely object and because it allowed similar testimony to be admitted without objection. They also argue that any error in the admission of Brown's testimony was harmless because the testimony concerns the obligations of the parties and is therefore only relevant to the Salinases' contract claims, which are immaterial to the DTPA judgment.

The admission and exclusion of evidence is committed to the trial court's sound discretion. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753 (Tex.1995). A person seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. *Id.* A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.* The standard for reversible error is that "the error complained of ... probably caused the rendition of an improper judgment." TEX. R.APP. P. 44.1(a)(1). We determine whether the case turns on the evidence at issue by reviewing the entire record. *City of Brownsville,* 897 S.W.2d at 753.

In the present case, the record shows that Norwest timely objected to Brown's testimony on the basis that it constituted an improper legal conclusion. We also find Norwest did not waive error by allowing the admission of similar testimony without filing an objection.

We agree with the Salinases, however, that the disputed testimony, which concerns whether Norwest assumed all duties and responsibilities held by Bay Area, is irrelevant to the judgment based on violation of the DTPA. The disputed testimony is relevant to the Salinases' breach of contract claims, but we find the evidence sufficient to show that Norwest's own conduct violated the DTPA. Norwest cannot show, therefore, that Brown's testimony probably caused rendition of an improper judgment and any error by the trial court in admitting the testimony is harmless. We overrule appellant's fourth point of error.

In its fifth point of error, Norwest contends the trial court erred in allowing the testimony of Debra Green, another witness for the Salinases, on the basis that she was not properly identified in response to interrogatories. Norwest's complaint is that the Salinases' interrogatory responses identified Green by name, telephone number, city and state of her last known address, but no street address was provided. Green's testimony recounted her experiences with Bay Area and Norwest. Like the Salinases, she had entered into an agreement for the construction of a home built by Bay Area and financed by Norwest. She testified that she experienced problems similar to those reported by the Salinases; Bay Area stopped construction on the home, liens were filed, and the house was never completed.

The Salinases argue Norwest waived any error regarding the admission of Green's testimony because it waited until she was called to testify at trial before objecting that she was improperly identified. In support, the Salinases direct our attention to *Lewis v. Western Waste Industries,* 950 S.W.2d 407, 410 (Tex.App.— Houston [1st Dist.] 1997, n.w.h.). In that

---

struct improvements, that's fine, they make advances; but all the terms and conditions in that original M. & M. contract became their responsibility too.

. . . .

Q: Do you believe your peers would agree with you that when the indebtedness talked about in this agreement is assigned to the lender, that that also means the lender is agreeing to become the builder?

A: I think that they are agreeing to see to all the featured terms and conditions of that contract, that they are going to be fulfilled in order to perfect their lien.

case, the court held that any right to exclude the testimony of an improperly identified witness is waived if the objecting party has not filed a motion for sanctions or a motion to compel, and instead, has intentionally waited until trial to move to strike the testimony of a witness. *Lewis,* 950 S.W.2d at 410 (citing *Remington Arms Co., Inc. v. Caldwell,* 850 S.W.2d 167, 170 (Tex.1993) (failure to obtain pretrial ruling on discovery disputes existing before trial constitutes waiver of any claim for sanctions based on conduct)). We hold that by failing to file a pretrial motion to compel proper identification of Green, Norwest waived any right to exclude her testimony. We overrule Norwest's fifth point of error.

## V. Mental Anguish Damages

■ By its sixth point of error, Norwest contends the evidence was legally and factually insufficient to support the jury's award of $71,364 for mental anguish damages and that the jury improperly attempted to reimburse the Salinases for mortgage payments by awarding the "oddly precise" amount paid on the loan as mental anguish damages.

Norwest also complains that mental anguish damages are not recoverable absent proof of a willful or grossly negligent violation of the DTPA. Under the DTPA, mental anguish damages are recoverable when there is proof of deceptive or unconscionable actions or courses of action committed "knowingly." *Sanchez v. Guerrero,* 885 S.W.2d 487, 494 (Tex.App.—El Paso 1994, no writ). The jury found that Norwest violated the DTPA and that such violations were committed knowingly. We have upheld the finding of a "knowing" violation because the jury could have based its finding on a determination that Norwest knowingly engaged in unconscionable conduct, and no challenge was raised to such a finding. Therefore, the jury's award of $71,364 for mental anguish is proper if supported by legally and factually sufficient evidence.

■ An award of mental anguish damages requires either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or other evidence of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Saenz v. Fidelity & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996) (quoting *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex. 1995)).

The record in the present case includes the Salinases' testimony that their marriage and their relationships with their daughters suffered a strain. Mrs. Salinas testified that she was unable to sleep, suffered severe stomach cramps, and often was unable to eat lunch because of stomach pain. She testified that the strain affected her work, that the pressure to "keep silent about it" made her feel "kind of desperate," and that she found it difficult to explain the situation to her daughters. Mr. Salinas testified that he sought medical attention and took prescription sleeping pills because he was often unable to sleep. He also testified that the strain of making two mortgage payments was "financially exhausting" and that the mental anguish caused by Norwest was an all-consuming "nightmare" that continued for four years. This testimony reveals the Salinases suffered "a high degree of mental pain and distress" that caused a serious disruption in their daily routine. *See Kold–Serve Corp. v. Ward,* 736 S.W.2d 750, 756 (Tex.App.—Corpus Christi 1987, writ dism'd w.o.j.) (holding evidence of financial and marital strain sufficient to support award of mental anguish damages). We find that the evidence is legally and factually sufficient to support the award of mental anguish damages because it addresses the nature and severity of the mental pain and distress the Salinases suffered over an extended period. Accord-

ingly, we overrule Norwest's sixth point of error.

 Norwest contends the jury's award of $71,364 in mental anguish damages improperly attempted to reimburse the Salinases for mortgage payments. Although juries must be given a measure of discretion in finding mental anguish damages, such discretion is limited. "Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Saenz*, 925 S.W.2d at 614; *see Parkway*, 901 S.W.2d at 444. Appellate courts are required to conduct a meaningful evidentiary review of the jury's findings. *Saenz*, 925 S.W.2d at 614. In the present case, the issue is not whether or how closely the amount awarded by the jury approximates the total paid by the Salinases in mortgage payments. Rather, the issue is whether there is evidence that the amount found is fair and reasonable compensation. We find that the amount awarded was fair and reasonable compensation for the mental anguish suffered by the Salinases.

## VI. Damages Awarded for Mortgage Payments

 In its eighth point of error, Norwest contends the trial court erred in allowing the award of damages for mortgage payments made by the Salinases before their home was completed. Norwest contends that under the DTPA, the Salinases may only recover "out of pocket" damages *or* "benefit of the bargain" damages.

The Salinases argue that Norwest incorrectly relies on the most recent version of the DTPA for its view of the damages which may be recovered by a prevailing consumer.[13] They further contend that under the applicable version of the DTPA, they are not limited to recovery of "out of pocket" damages or "benefit of the bargain" damages, but instead are entitled to recovery of all damages necessary to compensate for the total loss sustained.

 Under the applicable version of the DTPA, a consumer could recover "the amount of actual damages" caused by the defendant's false, misleading, or deceptive conduct. TEX. BUS. & COM.CODE § 17.50(b)(1) (Vernon 1987); *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 162 (Tex.1992). The amount of actual damages recoverable is "the total loss sustained as a result of the deceptive trade practice." *Arthur Andersen*, 945 S.W.2d at 816; *Henry S. Miller*, 836 S.W.2d at 162. Actual damages "includ[e] related and reasonably necessary expenses." *Henry S. Miller*, 836 S.W.2d at 162 (citations omitted). Therefore, such direct measures as "benefit-of-the-bargain" and "out-of-pocket" are not exclusive. *Id.* Other damages are permitted to ensure that a plaintiff is made whole. *Id.*

 At common law, actual damages can be either "direct" or "consequential." *Id.* at 163; *Arthur Andersen*, 945 S.W.2d at 816. Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. *Arthur*

---

13. Norwest cites TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon 1987 and Supp.1997). In 1995, the Legislature amended § 17.50(b)(1) to permit recovery of "economic damages" and, if the defendant acted knowingly, "damages for mental anguish," instead of "actual damages." Act of May 17, 1995, 74th Leg., R.S., ch. 414, 1995 Tex. Gen. Laws 2992. Under the applicable version of subsection (b)(1), a prevailing consumer was entitled to recover:

the amount of actual damages found by the trier of fact. In addition the court shall award two times that portion of the actual damages that does not exceed $1000. If the trier of fact finds that the conduct of the defendant was committed knowingly, the trier of fact may award not more than three times the amount of actual damages in excess of $1,000 . . .

TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon 1987).

*Andersen,* 945 S.W.2d at 816. For misrepresentation, there are two recognized measures of direct damages. *Henry S. Miller,* 836 S.W.2d at 163. The "out of pocket" measure, which operates on a restitutionary theory, measures the difference between the value of that which was parted with and the value of that which was received. *Id.* The "benefit of the bargain" measure, which utilizes an expectancy theory, evaluates the difference between the value as represented and the value actually received. *Id.* The DTPA allows the injured consumer to recover either the "out of pocket" measure or the "benefit of the bargain" measure of damages, whichever is greater. *Id.*

▮▮ Consequential damages, on the other hand, result naturally, but not necessarily, from the defendant's wrongful acts. *Id.* A consumer may recover consequential damages under the DTPA for a variety of injuries, including related and reasonably necessary expenses. *Id.* at 164. In order to be recoverable, however, consequential damages must be specifically pled. Tex.R. Civ. P. 56; *Henry S. Miller,* 836 S.W.2d at 164.

In the present case, the Salinases specifically pled for $17,865 for "mortgage payments made and loss of the use of the home." The jury was asked to consider, as an element of the Salinases' damages, "the mortgage payments made by Jose B. Salinas and Victoria B. Salinas prior to substantial performance." The Salinases presented evidence that from the time they began making mortgage payments in March 1992 until May 1993, when they moved into their (unfinished) home, their mortgage payments totaled approximately $17,841. During this period, the Salinases were required to make two mortgage payments, one for the home in which they were living and one to Norwest for the home which remained incomplete. The Salinases testified that they were required to obtain outside loans to meet the severe financial obligations imposed by the circumstances. We hold that the trial court's award of damages for mortgage payments made by the Salinases was proper and overrule Norwest's eighth point of error.

## VII. Attorneys' Fees

▮▮ In its seventh point of error, Norwest contends the trial court erred by "awarding attorney's fees as a percentage of DTPA damages." The Salinases contend this issue was not preserved for appellate review because Norwest raised no objection to the jury question underlying the award of attorney's fees. Norwest concedes that no objection was raised at trial, but argues no objection was necessary. In support, Norwest cites the supreme court's decision in *Arthur Andersen,* 945 S.W.2d at 818–19,[14] and contends that the holding in that case should be applied retroactively. We disagree.

To preserve a complaint regarding an improper foundation for an award of attorney's fees, an appellant must object and obtain a ruling from the trial court. Tex. R.App. P. 33.1(a); *see L & F Distributors v. Cruz,* 941 S.W.2d 274, 285 (Tex.App.—Corpus Christi 1996, writ denied). Norwest cites *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 799 (Tex.1994), for the proposition that the supreme court's holding in *Arthur Andersen* is dispositive and should be applied retroactively in this case. In *Ellis County,* however, the court noted that supreme court holdings should apply retroactively to cases pending in the courts of appeal only when "*a party has preserved the complaint.*" *Ellis County,* 888 S.W.2d at 799 (emphasis supplied).

---

**14.** In *Arthur Andersen,* the supreme court held that to recover attorney's fees under the DTPA, a plaintiff must prove fees are both reasonably incurred and necessary to the prosecution of the case and must ask the jury to award fees in a specific dollar amount, not as a percentage of judgment. *Arthur Andersen,* 945 S.W.2d at 819.

Because Norwest failed to object to the question which requested the jury to determine an award of attorney's fees calculated as a percentage of recovery, it waived any objection to the basis for the award. We overrule Norwest's seventh point of error.

## VIII. Inconsistent Jury Answers

■ In its fifteenth point of error, Norwest contends the jury's answers to Question 8,[15] reflecting the jury's finding of $45,000 for costs to repair and complete the Salinases' home and $3,000 for alternative housing, and Question 14, reflecting a finding of $34,000 as the difference between value received and purchase price or value given, are inconsistent. The Salinases argue that Norwest waived any objection by accepting the verdict and releasing the jury without objecting to the alleged conflict between the jury's answers.

■ In order to preserve error, the appellant must object to the conflict or inconsistency before the jury is discharged. *Durkay v. Madco Oil Co.*, 862 S.W.2d 14, 23 (Tex.App.—Corpus Christi 1993, writ denied). Norwest failed to preserve error because it did not object to the conflict or inconsistency prior to discharge of the jury. Norwest's fifteenth point of error is overruled.

## IX. Recitations in Judgment

In its seventeenth point of error, Norwest contends the judgment improperly contains the jury's findings on issues other than Norwest's violation of the DTPA. The Salinases argue the findings are material because Norwest continues to mischaracterize this dispute as a mere contract case.

■ When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief. *Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex.1988). When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings, but may seek recovery under an alternative theory if the judgment is reversed on appeal. *Id.* Because the Salinases elected recovery under the DTPA and the judgment can be supported on that basis, any error as to the inclusion of the jury's findings on issues other than Norwest's violation of the DTPA is harmless. We overrule Norwest's seventeenth point of error.

## X. Remaining Points

The remainder of Norwest's points relate to the Salinases' common law causes of action for breach of contract, fraud, negligent misrepresentation, and gross negligence. Norwest's first point concerns submission of a question relating to the Salinases' contract claims; points of error two and three concern the trial court's refusal to submit instructions applicable to causes of action other than violation of the DTPA. Points of error thirteen and fourteen challenge the legal and factual sufficiency of the evidence supporting the jury's findings of fraud and negligent misrepresentation. Because the trial court's judgment can be supported on the basis of the Salinases' DTPA claims, we need not address these remaining points. TEX. R.APP. P. 47.1.

## XI. Conditional Cross-points

By two conditional cross-points, the Salinases contend (1) the trial court erred in failing to include prejudgment interest

---

**15.** Question 8 addresses damages available under the DTPA. Question 14 addresses dam-

ages available for negligent misrepresentation.

from the calculation of additional damages and (2) that judgment should be entered on the jury's findings of negligent misrepresentation and gross negligence if we reverse the judgment based on the DTPA. Because we affirm the trial court's judgment, and consideration of the Salinases' cross-points is conditioned on our reversal or modification of any part of the judgment, we do not consider the conditional cross-points.

The judgment of the trial court is AFFIRMED.